**AMERICAN STANDARD CREDIT, INC.,**
**Plaintiff-Appellee,**

v.

**NATIONAL CEMENT CO.,**
**Defendant-Appellee,**

**Programming and Systems, Inc.,**
**Defendant-Appellant,**

**International Computer Corp., et al., Defendants.**

No. 78–2231.

United States Court of Appeals,
Fifth Circuit.

April 20, 1981.

Richard F. Ogle, Birmingham, Ala., for defendant-appellant.

Bradley, Arant, Rose & White, John H. Morrow, Donald M. James, Birmingham, Ala., for American Standard Credit.

Thomas, Taliaferro, Forman, Burr & Murray, John D. Clements, Eric L. Carlton, Birmingham, Ala., for Nat. Cement Co.

Before TUTTLE, RANDALL and TATE, Circuit Judges.

RANDALL, Circuit Judge:

In this complicated diversity case from Alabama, we attempt to resolve the competing claims of various parties to an expensive piece of coal mining equipment—specifically, a WABCO 333FT tractor-scraper, serial number 31811, that was sold more than once by the same dealer. Because we find that one of the district court's key factual findings is clearly erroneous, we must reverse its judgment; but because the district court did not make findings on certain other crucial issues of fact, we must remand for further proceedings consistent with this opinion.

## I. FACTUAL BACKGROUND

### A. The Parties Involved in the Dispute

The companies that are either directly or indirectly involved in this litigation are many; they share many principals, and some control others in varying degrees. Yet it is essential to keep clearly in mind which actors are which, and the extent to which the various corporations' identities are distinct from each other.

The first company is Programming and Systems, Inc. ("PSI"), a New York corporation with its principal offices in New York City. PSI's principal business involved data processing and vocational education. Prior to February 14, 1974, PSI owned 1,142,911 of 1,533,892 outstanding shares (73.5%) of International Computer Corporation ("ICC"), a Delaware corporation whose principal offices were shared with PSI in New York City.

Next in our cast of characters is a trio of Alabama corporations, all of whose principal offices were in Alabama. The first was Vulcan Machinery Co., Inc. ("Vulcan"), a retail dealer in mining equipment. The president and majority stockholder of Vulcan was Charles S. Pettyjohn, Jr. Pettyjohn was also the president and majority stockholder of ISCO, Inc. ("ISCO"), which owned various coal leases in the southeastern United States. The third company was Vulcan Energy Resources Corp. ("VERCO"), which carried out the actual mining operations on the leases owned by ISCO. As of February 1974, Pettyjohn and Joseph Needle each owned some 38.3% of VERCO's stock; other individuals owned some 5.71% of VERCO's stock; the balance consisted of "treasury contingent shares" owned by the corporation itself.

The next line of companies had at its head National Cement Co., Inc. ("National Cement"), another Alabama corporation with its principal place of business in Alabama. National Cement was heavily dependent upon coal as an energy source for its cement plant in Ragland, Alabama. In hopes of ensuring a steady supply of coal for this plant, National Cement created a

wholly owned subsidiary named N C Mining Co., Inc. ("N C Mining"), an Alabama corporation with its principal place of business in Alabama.

By an agreement dated January 24, 1975, N C Mining and ISCO formed a joint venture named NATISCO. Pettyjohn was named NATISCO's chief operating officer.

The plaintiff in this suit is American Standard Credit, Inc. ("ASCI"), a Delaware corporation whose principal place of business was in Peoria, Illinois as of the time of trial, and in Pittsburgh, Pennsylvania during the events that gave rise to this litigation. ASCI is a wholly owned subsidiary of American Standard, Inc.; the bulk of ASCI's business relates to financing the sales of heavy mining equipment produced by a division of American Standard, Inc. known as Westinghouse Air Brake Company ("WABCO"). Vulcan was WABCO's franchisee for Alabama. Because WABCO was from time to time a creditor of Vulcan, WABCO obtained and exercised a contractual right to name one member of Vulcan's board of directors; thus, WABCO's manager of domestic credit, B. L. Zimmerman, was a member of Vulcan's board of directors at the time of the events that gave rise to this litigation.

Last among the dramatis personae is Invesco International Corp. of Alabama No. 2 ("Invesco"), another Alabama corporation with its principal place of business in Alabama. Invesco was also engaged in mining production activities.

*B. The 1974 Agreements Between PSI, ICC, VERCO, ISCO, and Pettyjohn*

As noted above, prior to February 13, 1974, PSI owned 1,142,911 of 1,533,892 outstanding shares of ICC stock. On that date, PSI and Joseph Needle agreed (ASCI exh. 26) that Needle would purchase 1,025,000 of those shares for $850,000, to be paid in 36 monthly installments. Some of PSI's remaining holdings in ICC stock were to go to the promoter of the deal as a "finders fee,"

with the balance to be retained by PSI as an investment.

On March 8, 1974, ICC and the stockholders of VERCO entered into a "Reorganization Agreement" (ASCI exh. 27), through which the VERCO stockholders transferred all their VERCO stock to ICC. Thus, VERCO became a wholly owned subsidiary of ICC. In return, the former VERCO stockholders (chiefly Needle and Pettyjohn) were granted the right to receive authorized-but-unissued ICC stock from ICC; the precise amount of stock was keyed to VERCO's net earnings over a five-and-one-half year period, but the earnings themselves were to be used to purchase PSI's holdings in ICC stock pursuant to the February 13, 1974, agreement between Needle and PSI. Pettyjohn was given the day-to-day control of VERCO. The end result of the Reorganization Agreement, assuming that VERCO's profits lived up to the parties' expectations, was that the former VERCO stockholders would end up owning a majority of the stock of ICC.

The success of this "earn-out" depended on VERCO's profitability as a coal mining operation, which in turn depended on ICC's being able to supply VERCO with certain heavy mining equipment. Accordingly, PSI, ICC, VERCO, Vulcan, ISCO, and Pettyjohn entered into a "Guaranty Agreement" (ASCI exh. 27) dated March 20, 1974. Under the terms of this Guaranty Agreement, PSI agreed to guarantee the obligations of ICC in connection with ICC's purchase or lease-purchase of coal mining equipment for VERCO. In return, ICC agreed to pay PSI 3% annually on the aggregate principal amount of PSI's outstanding guarantees of ICC's obligations.[1]

ICC and the former VERCO stockholders also made certain agreements in PSI's favor in an amendment, dated March 19, 1974, to the Reorganization Agreement dated March 8, 1974. Pettyjohn personally guaranteed that VERCO would have adequate working

---

1. Further, ICC agreed to issue one share of ICC stock to PSI for each $5 in outstanding guarantees, up to a maximum of 200,000 shares; ICC had an option to repurchase those shares, however, at a price that increased over time.

capital; as security for this promise, Pettyjohn agreed to pledge his two ranches in Florida. Needle transferred to ICC[2] his rights under the February 13 agreement to purchase 1,025,000 shares of ICC stock from PSI; if ICC did not have sufficient earnings to make the installments due under the February 13 agreement, Pettyjohn and Needle agreed to provide ICC with those funds. Needle also agreed to give Pettyjohn his proxy for any ICC shares held in Needle's name for so long as Pettyjohn was personally obligated to ensure that VERCO had adequate working capital. PSI was given the right to designate a majority of ICC's board of directors until both (1) ICC had finished making the installment payments on the 1,025,000 shares of ICC stock it was obligated to purchase from PSI under the February 13 agreement; and (2) PSI's guarantees on behalf of VERCO were either terminated or VERCO's net worth was equal to or greater than the aggregate unpaid amount of PSI's guarantees. PSI was also given the right to name the directors of Pettyjohn's other two companies, Vulcan and ISCO, in the event that Pettyjohn defaulted on any of his obligations under the Reorganization Agreement as amended or other agreements executed pursuant thereto.

The last part of the deal was an "Indemnity and Collateral Agreement" (ASCI exh. 27) between PSI, ICC, VERCO, ISCO, and Pettyjohn, also dated March 20, 1974. That agreement defined "debt" to mean all sums of money then or thereafter payable *by PSI* in connection with its guarantee of the obligations of ICC or VERCO. ICC, VERCO, ISCO, and Pettyjohn agreed to indemnify PSI against such debt; to secure their obligation to indemnify PSI from such debt, ICC, VERCO, ISCO, and Pettyjohn granted PSI a security interest in certain property. Included in the description of the collateral subject to the security interest was all after-acquired equipment of ICC, VERCO, and ISCO. On April 30, 1974, PSI filed with the Alabama Secretary of State a financing statement (ASCI exh. 6) listing ISCO's after-acquired equipment as collateral.

## C. PSI's Dealings with Scraper 31811

In October 1974, VERCO wished to obtain a WABCO 333FT scraper for use in its mining operations near Curry, Alabama, at the so-called "Curry pit." For a number of reasons—chief among them VERCO's immediate need for the equipment and the high interest rates prevailing at the time—PSI decided to purchase a WABCO scraper outright, rather than guaranteeing ICC's purchase of a scraper, as would have been the case had the transaction been structured so as to fall within the terms of the Guaranty Agreement. Accordingly, PSI purchased a new WABCO 333FT scraper, serial number 31811 ("Scraper 31811" or simply "the Scraper"), from Vulcan on October 16, 1974. (See PSI exh. 20.) PSI wired payment to Vulcan in the amount of $243,547.25. The actual purchase price was $248,517.60, but PSI retained 2% of that amount as a commission from Vulcan on the sale (tr. 682–83). PSI took an investment tax credit equal to seven percent of the Scraper's list price (tr. 175–76). Although it is uncertain where Scraper 31811 was at the moment of the sale, it is uncontested that it was soon delivered to VERCO's job site at the Curry pit.

Coincidental with PSI's purchase of Scraper 31811, PSI and ICC entered into a lease agreement (ASCI exh. 23) covering that scraper ("the PSI–ICC lease"). The term of the lease was 84 months, commencing on October 16, 1974. The monthly rental was $5,485.15; the aggregate rental payments over the life of the lease was thus equal to $460,752.60. Under the lease's terms, ICC was obligated to: (1) pay the total rental due over the term of the lease; (2) pay all fees and taxes on Scraper 31811; (3) maintain Scraper 31811 and pay for all fuel, service, overhauls, and replacements; (4) bear the risk of damage to or loss or

---

2. The original version of the reorganization agreement provided that Needle would transfer to VERCO his right to purchase the ICC stock from PSI; the amended version, however, provided that he would transfer that right to ICC rather than VERCO.

destruction of Scraper 31811; (5) maintain full insurance on Scraper 31811; and (6) execute financing statements listing Scraper 31811 as collateral to secure ICC's debts to PSI. The lease also provided that upon execution or termination of the lease term, ICC would return Scraper 31811 to PSI in its original condition, excepting only reasonable wear and tear. Finally, the lease specifically provided that "[PSI] and [ICC] agree that this Lease is and is intended to be a true lease (and not a lease intended as a security or a lease in the nature of a security interest) and further agree to treat same as a true lease for all purposes, including, without limitation, legal, tax, clerical and accounting." The lease itself did not include any provision whereby ICC would obtain any equity in Scraper 31811; neither did it provide ICC with an option to purchase Scraper 31811 from PSI at the end of the lease term. (See tr. 461.) Neither did any evidence introduced at trial indicate an implicit or explicit collateral agreement between PSI and ICC providing for a change in ownership of Scraper 31811 at any time.

Immediately after the PSI–ICC Lease became effective, ICC subleased Scraper 31811 to its subsidiary, VERCO. The sublease contract ("the ICC–VERCO Sublease") (ASCI exh. 23) merely incorporated the PSI–ICC Lease's terms by reference, except that VERCO was obligated to pay ICC a monthly rental of $4,795.59, plus an additional rental of $1 per ton of coal mined by VERCO during the sublease period.

Thus, ICC's monthly rental payments to PSI under the PSI–ICC Lease were some $689.56 higher than VERCO's monthly rental payments to ICC under the ICC–VERCO Sublease; in turn ICC did not pay PSI the $1 per ton coal royalty that VERCO paid ICC. There is testimony in the record (e. g., tr. 743) which would indicate that the additional $689.56 that ICC paid PSI was intended to correspond to the 3% payment that ICC would have been obligated to pay under the Guaranty Agreement had PSI guaranteed ICC's purchase of a scraper rather than PSI purchasing a scraper itself.

As part of the same transaction in which PSI purchased Scraper 31811 from Vulcan and leased it to ICC (who in turn subleased it to VERCO), Pettyjohn signed a document (ASCI exh. 22) that had been prepared by Lester Tanner, counsel for PSI. This document, addressed to ICC, read as follows:

> This is to confirm that [Vulcan] as he [*sic*] seller of equipment either owned by or leased to International Computer Corporation and subleased by International Computer Corporation to Vulcan Energy Resources Corporation, will, without cost to you or Vulcan Energy Resources Corporation, maintain, resell or lease said equipment and remain responsible for any loss incurred by you or Verco in connection therewith.

Below Pettyjohn's signature on behalf of Vulcan appears this legend: "Equipment Lease October 16, 1974 Wabco new Model 333FT Tractor-Elevating Scraper with auxiliary equipment." According to Tanner's testimony (tr. 353–60), the purpose of this document was to confirm that Vulcan's obligations under the Guaranty Agreement—i. e., to provide recourse in the event of a default by VERCO on its obligations relating to equipment obtained by ICC under PSI's guarantee, and to act as an agent for resale of the scraper in the event of default—also applied to VERCO's obligations on Scraper 31811, which was not purchased by ICC under PSI's guarantee, but instead was purchased by PSI directly.

As required by the terms of the PSI–ICC Lease and the ICC–VERCO Sublease, both ICC and VERCO executed financing statements (ASCI exh. 24) on Form UCC–1 identifying Scraper 31811 as collateral to secure their debts to PSI. These financing statements were filed (ASCI exh. 25) with the Alabama Secretary of State on November 21, 1974. According to Tanner's undisputed testimony (tr. 443–44), these financing statements were filed to protect against the possibility that a court might find that either the PSI–ICC Lease or the ICC–VERCO Sublease was not a "true lease," but a "lease intended as security," which would be treated under the UCC as a sale in which PSI retained only a security interest in

Scraper 31811; in that event, PSI's retained purchase money security interest would be perfected by virtue of the filings.

From October 1974 to February 1976, PSI regularly billed ICC (PSI exh. 29) in the amount of $5,485.15, the monthly rental under the PSI–ICC Lease. Over the same period, ICC regularly billed VERCO (PSI exh. 30) in the amount of $4,795.59, the monthly rental under the ICC–VERCO Sublease. VERCO regularly paid ICC, and ICC regularly paid PSI, for the rentals covering the months through November 1975 (tr. 749–50). VERCO also paid ICC a total of $394,874.05 (ASCI exhs. 49, 50 & 51) in royalties based on the tons of coal VERCO mined during that period.

By March 1976, however, VERCO, ICC, ISCO, and Pettyjohn had defaulted on their obligations to PSI. After proper notice that the security agreements and leases were in default, PSI foreclosed on all of its debtors' mining equipment that was subject to its security interests, and retook possession of the equipment that it had leased to ICC and VERCO. Under an agreement dated March 4, 1976 (ASCI exh. 45), PSI sold all of this equipment to Invesco, who at that time was taking over VERCO's mining operations at the site where most of the equipment was located, known as the De-Kalb No. 3 pit. Included in the equipment PSI sold to Invesco was Scraper 31811; Invesco agreed to make payments to PSI on Scraper 31811, and subsequently made those payments up to the time when this litigation commenced.

### D. The "Second Sale" of Scraper 31811

In January 1975, ISCO and N C Mining entered into a joint venture agreement (ASCI exh. 16) to form NATISCO. NATISCO was to mine coal for the use of National Cement's Ragland cement plant. ISCO was responsible for obtaining the necessary coal leases, and was the managing partner in the venture. Responsibility for NATISCO's day-to-day operations was vested in Pettyjohn, with the agreement that both venturers had to approve certain "major decisions" such as the acquisition of mining equipment. NATISCO planned to take over mining operations at the Curry pit, which VERCO had until recently been mining. Like VERCO, NATISCO also required one or more WABCO 333FT scrapers to mine this pit, and set about to acquire them from Vulcan.

Vulcan's secretary-treasurer, Jack Losse, contacted ASCI in mid- to late-January 1975 in hopes that ASCI would finance the retail sale of the two scrapers that NATISCO wished to buy. Although ASCI had never done any retail financing before (having been limited in the past to financing acquisitions of WABCO equipment by WABCO dealers and floor-planning WABCO equipment for WABCO dealers) (tr. 146), ASCI agreed to finance NATISCO's purchase of two WABCO 333FT scrapers if N C Mining's parent company, National Cement, would guarantee NATISCO's obligations. National Cement agreed, and on February 14, 1975, Vulcan and NATISCO signed a "lease" agreement for each of two scrapers, along with an "option to purchase" agreement for each. The leases provided that NATISCO would pay Vulcan 36 monthly rental payments, the first 35 of which would be in the amount of $9,848.31, and the last of which would be in the amount of $9,848.65; the aggregate of the rentals due on each scraper over the life of the leases was to be $354,539.50. The purchase options provided that NATISCO could purchase the scrapers from Vulcan at the conclusion of the lease term for $2 each.

Unfortunately, one lease-purchase agreement (ASCI exh. 1) covered Scraper 31811 —the very same scraper that Vulcan had sold to PSI in October 1974. The other lease-purchase agreement (Nat'l Cement exh. 1) covered a WABCO 333FT scraper whose serial number was 31819 ("Scraper 31819").

Following its customary policy, ASCI checked with WABCO to see if Vulcan had paid WABCO in full for each of the scrapers before it had entered into the lease-purchase agreements (tr. 138–140). ASCI learned that Vulcan had paid WABCO in full for Scraper 31811; ASCI did not ask

WABCO *when* Scraper 31811 had been paid for, although WABCO concededly could have supplied ASCI with that information. WABCO told ASCI that Vulcan still owed WABCO $210,844.10 on open account for the wholesale price of Scraper 31819.

Accordingly, when ASCI accepted Vulcan's assignation of its rights to receive rental payments under both of the lease-sale agreements with NATISCO on February 28, 1975, ASCI sent Vulcan two different checks in return. The check for the lease rights on Scraper 31811 was in the amount of $269,926.50 (ASCI exh. 3), which represented the full purchase price of a WABCO 333FT scraper as of that time ($284,200.00), less a "hold-back" of $14,273.50; the hold-back, which was equal to 50% of Vulcan's profit (tr. 127), was to be paid to Vulcan upon completion of the lease payments. The check for the lease rights covering Scraper 31819 was in the amount of $61,412.29 (ASCI exh. 2); ASCI sent a check for $210,844.10 directly to WABCO to pay off Vulcan's remaining open-account balance on Scraper 31819, and held back $11,943.61 (tr. 108–09). Vulcan deposited the proceeds from the assignment of the lease on Scraper 31811 in its own bank account, and never credited VERCO's open account with Vulcan for these proceeds; rather, the funds were used to pay Vulcan's own creditors (*e. g.*, tr. 236, 260).

On March 4, 1975, ASCI filed a financing statement (ASCI exhs. 9 & 10) with the Alabama Secretary of State listing Scraper 31811 as collateral; NATISCO was listed as the debtor, Vulcan was listed as the secured party, and ASCI was listed as the assignee of the secured party.

NATISCO "took delivery" of Scraper 31811 as "new equipment" at the Curry pit on March 11, 1975, according to a delivery receipt from Vulcan (PSI exh. 1). At about this time, VERCO had ceased its operations at the Curry pit in preparation for the commencement of mining operations at a different site; NATISCO was to take over mining operations at the Curry pit (tr. 171–72).

At some point prior to purchasing the lease-purchase agreements from Vulcan, ASCI initiated a search of the Alabama Secretary of State's records to determine whether there were any competing security interests covering the property of either of the joint venturers, ISCO and N C Mining. ASCI did not search for financing statements covering the property of ICC, VERCO, or Vulcan because ICC and VERCO were not parties to the transaction, and ASCI assumed (tr. 82) that Vulcan owned the equipment it was purporting to sell.

ASCI did not learn of PSI's blanket security interest in ISCO's after-acquired equipment (ASCI exh. 6) until after ASCI had already accepted the lease-purchase agreements from Vulcan on February 28, 1975.[3] When ASCI learned of PSI's security interest through the search with the Alabama Secretary of State, it instructed Pettyjohn to set about obtaining a subordination agreement from PSI. Tanner testified that Pettyjohn told him by telephone that NATISCO was purchasing some new mining equipment from Vulcan. Based on this conversation, Tanner advised PSI in essence that it was in PSI's best interests to agree to the subordination: having a second lien on ISCO's new after-acquired mining equipment would be better than blocking the acquisition by insisting on holding a first lien. According to Tanner's testimony (tr. 361–64), neither Tanner nor PSI knew that the "new" mining equipment which NATISCO was purchasing was actually the same scraper that PSI had purchased in October 1974. By letter to ASCI dated March 31, 1975, PSI agreed to subordinate its security interest in ISCO's after-acquired property "to the extent that it may cover such *new* mining equipment, to the borrowings by the joint venture used for

---

3. The search first turned up a blanket financing statement listing ISCO as debtor, with a company called Leasing Services Corporation from Atlanta as creditor. By letter dated February 29, 1975 (PSI exh. 2), Leasing Services Corporation agreed to subordinate its security interest in ISCO's after-acquired equipment *to* ASCI's security interest in Scrapers 31811 and 31819.

the purchase of such *new* mining equipment." (ASCI exh. 7; emphasis added.) In response, ASCI sent PSI a letter dated April 7, 1975 (ASCI exh. 8), which read as follows:

> Thank you for your letter of March 31, 1975 subordinating your company's security agreement to two WABCO 333FT Tractors/Scrapers, serial numbers 31819 and 31811.

> As per your request, we are enclosing copies of our financing statements which list the specific units covered by our security agreement with Natisco.

Both Tanner and PSI's chairman-president, Irwin Mautner, testified that they did not notice that one of the serial numbers listed in this letter corresponded with the serial number of the scraper PSI had purchased in October 1974.

NATISCO made payments to ASCI on Scraper 31811 throughout the remainder of the year until November 25, 1975 (ASCI exh. 11). At that time, ISCO agreed to purchase all of the stock of N C Mining from National Cement; the transfer became effective on December 18, 1975 (ASCI exh. 40). On December 20, 1975, NATISCO transferred to National Cement all of its rights under its lease-purchase agreements with ASCI, covering both scrapers (ASCI exh. 46). National Cement immediately leased both scrapers back to NATISCO at a monthly rental equal to the payments due to ASCI (*i. e.*, $9,848.31 each) (ASCI exh. 41). On January 26, 1976, ASCI, National Cement, and NATISCO formally agreed that National Cement would assume NATISCO's obligations to ASCI on both Scraper 31811 (ASCI exh. 13) and Scraper 31819 (Nat'l Cement exh. 7). Thus, National Cement became obligated to ASCI to make payments on both scrapers; NATISCO was released from further liability to ASCI, but was liable to National Cement under the leases.

NATISCO, however, made no payments under its lease with National Cement, and by letter dated March 4, 1976 (Nat'l Cement exh. 17), National Cement declared the lease to be in default. National Cement subsequently paid ASCI off for Scraper 31819 in October 1976 (Nat'l Cement exhs. 4, 5 & 6), and sold it to another company in mid-1976 (tr. 885); but its problems with Scraper 31811 were just beginning.

Some time prior to November 25, 1975 (tr. 828–29), Scraper 31811 had been moved from the Curry pit to NATISCO's Robbins mine in DeKalb County, Alabama, sometimes referred to as the DeKalb No. 3 mine. On or about March 3, 1976, National Cement and Invesco contracted for Invesco to mine the DeKalb No. 3 site, and National Cement intended to lease Scraper 31811 to Invesco for that purpose. It was at about this same time, however, that PSI declared its leases and security agreements with VERCO, ICC, and ISCO to be in default; after repossessing certain equipment and other property in the hands of its lessees/debtors, PSI purported to sell Scraper 31811 to Invesco. By mid-March, PSI and National Cement were aware of each other's conflicting claims to Scraper 31811.

Invesco continued to use Scraper 31811 as late as June 1976, making payments to PSI under the terms of the foreclosure sale. Although National Cement had made two payments to ASCI on Scraper 31811 (ASCI exh. 15), it ceased making further payments to ASCI when it learned of PSI's conflicting claims. By letter dated June 7, 1976 (Nat'l Cement exh. 10), National Cement demanded adequate assurances from ASCI that National Cement had marketable title to Scraper 31811. By responding letter dated June 23, 1976 (Nat'l Cement exh. 11), ASCI took the position that it was not obligated to give assurances of title to National Cement, and that PSI's claims were not valid. By letter dated July 15, 1976 (Nat'l Cement exh. 12), National Cement declared that its obligations to ASCI were cancelled and demanded the return of some $128,928.03 that NATISCO and National Cement had paid ASCI. This lawsuit was filed by ASCI on the following day. In January 1977, Scraper 31811 was moved to Thompson Tractor Company's lot; in July 1977, with permission of the district court, Scraper 31811 was sold for $95,000.00. This

sum, along with $56,680.06 that had been paid by Invesco to PSI on Scraper 31811, was placed into an escrow fund pending the disposition of the suit.

The issue that was most hotly disputed at trial concerned PSI's knowledge of or acquiescence in Vulcan's sale of Scraper 31811 to NATISCO. Jack Losse, the secretary-treasurer of Vulcan, testified that on one or more occasions, he had discussed with PSI representatives the possibility of Vulcan selling Scraper 31811 to NATISCO on PSI's behalf; the plan, according to Losse, was that Vulcan would subsequently give PSI a brand new scraper (the so-called "replacement scraper") that it had on order from WABCO. Tanner, Mautner, and Greenstein (PSI's counsel, chairman-president, and treasurer, respectively) testified to the contrary—i. e., .that the conversations alleged by Losse never took place. Losse and Pettyjohn also testified that they had discussed the "replacement scraper" with PSI representatives after the second sale had taken place, and that the PSI representatives had not objected to the fact that the second sale had taken place. Again, the PSI witnesses denied that these conversations took place. Thus, the answer to this basic question—whether PSI in effect agreed that Vulcan could act as its agent in selling Scraper 31811 to NATISCO, or acquiesced in the second sale after the fact—depended essentially on a credibility determination that could only be made by the trier of fact.

## II. ACTION IN THE COURT BELOW

### A. The Contentions of the Parties at Trial

ASCI sued National Cement, Invesco, PSI, VERCO, ICC, and Charles Stern (as receiver for Vulcan, which was in Chapter 11 bankruptcy proceedings). Jurisdiction was founded on diversity of citizenship, 28 U.S.C. § 1332 (1976), and the amount in controversy well exceeded $10,000. ICC and VERCO failed to appear, and Stern was dismissed without prejudice on ASCI's motion. ASCI sought money damages from National Cement corresponding to the payments due under its lease-purchase agreement (ASCI exhs. 1, 13, 46) with National Cement. ASCI also sought a declaratory judgment to the effect that all of the defendants' competing claims to the Scraper were invalid under the following theories: (1) PSI had subordinated its interest to that of ASCI, or was estopped from claiming that its subordination was ineffective; (2) Vulcan's conveyance of Scraper 31811 to NATISCO in the ordinary course of business conveyed an interest free and clear of any claim of PSI or any other defendant; (3) PSI acquiesced in the "second sale"; and (4) the claims of Invesco and ICC derived through PSI.

National Cement denied any obligation to ASCI, claiming that (1) ASCI could not recover because it had not qualified to do business in Alabama; (2) National Cement's lease-purchase agreement with ASCI had properly been cancelled when ASCI failed to give adequate assurances of performance upon National Cement's request for such assurances; and (3) if PSI's claim were valid, National Cement's contract with ASCI was void.

PSI contended that its interest in Scraper 31811 prior to its sale to Invesco was superior to any interest claimed by National Cement or ASCI.[4] Invesco made essentially the same argument, for its claim to the Scraper derived through its purchase from PSI.

---

4. On appeal, ASCI and National Cement argue that neither PSI's pleadings nor the pretrial order included the theory that PSI claimed an *outright ownership interest, rather than a se-curity interest,* in Scraper 31811 prior to its sale of the Scraper to Invesco. While this is true, our review of the record convinces us that this issue—i. e., whether PSI's "lease" to ICC was a "true lease" or a disguised sale—was tried by the consent of parties. The district court made a finding of fact thereupon. Fed.R. Civ.P. 15(b) makes clear that "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.... [F]ailure ... to amend [the pleadings] does not affect the result of the trial of these issues." *See generally* 6 C. Wright & A. Miller, Federal Practice and Procedure § 1493 (1971).

National Cement counterclaimed against ASCI for $128,028.03 (plus interest, costs, and attorneys' fees)—the sum paid by National Cement and NATISCO to ASCI on Scraper 31811. National Cement also cross-claimed against PSI, claiming that in the event National Cement was found liable for lease payments to ASCI, PSI was bound to reimburse National Cement for any rentals attributable to · the period when Scraper 31811 was in the possession of PSI or Invesco. PSI and Invesco defended against the cross-claim on grounds that National Cement had acquiesced in Invesco's possession of Scraper 31811, or in the sale of Scraper 31811 by PSI to Invesco.

Invesco cross-claimed against PSI, urging that in the event that National Cement prevailed in its cross-claim against Invesco or in the event that ASCI's interest in Scraper 31811 was determined to be superior to that of PSI, PSI was bound to reimburse Invesco for all sums that Invesco was ordered to pay to National Cement and all sums tht Invesco had paid PSI in connection with Invesco's purchase of Scraper 31811 from PSI. This cross-claim was severed from the main action, and is not before us on appeal.

### B. The Decision of the District Court

The key factual finding upon which the remainder of the district court's findings and conclusions were based had to do with the nature of PSI's interest in Scraper 31811 after it had leased the Scraper to ICC, who in turn leased it to VERCO. The district court apparently treated the lease from PSI to ICC as being, in effect, a disguised sale in which PSI retained only a · security interest in Scraper 31811, rather than being a "true lease." The statutory predicate for such a holding, although not cited by the court, is in sections 1–201(37) and 9–102(1)(a) of the 1962 version of the Uniform Commercial Code as in effect in Alabama, Ala. Code §§ 7–1–201(37) and 7–9–102(1)(a) (1975).[5]

The court then characterized PSI's retained security interest as a purchase money security interest under section 9–107, and characterized ASCI's interest as also being a purchase money security interest. Although PSI's purchase money security interest was perfected first by its earlier filing, the court held that PSI's security interest had been lifted from Scraper 31811 when VERCO paid ICC coal royalties of some $394,874.05 that VERCO was not contractually obligated to pay; those royalties inured to PSI's benefit, according to the district court, when PSI foreclosed on ICC's assets. As for PSI's blanket security interest in ISCO's after-acquired property, the court held that this security interest was subordinated to ASCI's purchase money security interest under section 9–312(4); and that in any event, whatever security interests PSI had in ISCO's after-acquired property disappeared upon payment in full of the debt secured. The court also held that Invesco's claims to Scraper 31811, since they traced through PSI, were subordinated to ASCI's purchase money security interest.

In addressing the dispute between ASCI and National Cement, the court found that ASCI need not have qualified to do business in Alabama in order to prosecute its claim against National Cement. The court then concluded that because of a valid "waiver of defenses" clause in the lease-purchase agreement between Vulcan and NATISCO (subsequently assigned to ASCI and National Cement, respectively), National Cement was not entitled to demand adequate assurances of performance from ASCI under the lease-purchase agreement. Alternately, the court held that because ASCI was no more than a creditor of National Cement under the lease-purchase agreement, rather than being a seller, National Cement had no right to demand adequate assurances of performance, and hence could not contend validly to have cancelled the lease-purchase agreement when ASCI failed to provide the

---

5. For convenience, all citations to the 1962 version of the Uniform Commercial Code as in effect in Alabama will be made simply by reference to the sections of the uniform act; those few particulars in which the Alabama version of the Code differs materially from the uniform act will be specifically noted as such.

requested adequate assurances of performance. The court also rejected National Cement's claim that ASCI had breached its warranty of title in the lease-purchase agreement, again on the ground that ASCI was not a seller.

The court's amended judgment ordered that the escrowed proceeds from the sale of Scraper 31811 be paid to National Cement; National Cement was ordered to pay such proceeds to ASCI in partial satisfaction of the judgment against National Cement in the amount of $226,511.47, which amount represented the remaining amounts due from National Cement under its lease-purchase agreement with ASCI. The court also entered judgment against PSI and Invesco in favor of National Cement in the amount of $21,940.60, representing the reasonable rental value of Scraper 31811 during the period National Cement was deprived of its use by PSI and Invesco. Finally, the court reserved jurisdiction to determine the cross-claim of Invesco against PSI, which cause had been severed for separate trial.

## C. The Contentions of the Parties on Appeal

PSI has appealed from that portion of the court's judgment which ordered that National Cement was entitled to receive the $151,680.06 escrow fund as compensation for the Scraper, and that portion of the court's judgment which ordered that PSI was liable to National Cement in the additional amount of $21,940.60 for the reasonable rental value of the Scraper during the time National Cement was deprived of its possession. On appeal, PSI argues that the district court erred in five respects: first, in finding that ASCI had acquired a legally enforceable interest in the Scraper when it financed the second sale; second, in finding that the Scraper had been freed from PSI's security interests by virtue of the satisfaction of the underlying debts; third, in finding that PSI had effectively sold the Scraper to VERCO through ICC, rather than merely leasing it; fourth, in finding that PSI's foreclosure on ICC's property, which

included royalty overcharges paid ICC by VERCO, satisfied the debts underlying PSI's security interests in the Scraper, when this theory was neither pleaded by ASCI and National Cement nor tried by consent; and last, in finding that such overcharges actually inured to PSI's benefit.

Invesco has not appealed from the judgment. ASCI originally cross-appealed from the judgment insofar as it failed to award attorneys' fees and interest on the past due payments, and National Cement originally cross-appealed from the judgment insofar as it found in favor of ASCI against National Cement. Both of these cross-appeals, however, were dismissed upon motion from ASCI and National Cement. Subsequently, ASCI and National Cement have filed a joint brief urging that the judgment of the district court be affirmed. They argue that the district court was not clearly erroneous in finding that the PSI–ICC Lease was a lease intended as security rather than a true lease. In the alternative, they urge that we should affirm on other grounds, viz., under theories of subordination, entrustment, or estoppel. ASCI and National Cement also argue that ASCI's purchase money security interest took priority over PSI's security interest in ISCO's after-acquired equipment under section 9–312(4); that the issue of satisfaction of PSI's security interest through the excessive royalty payments was included in the pleadings and pretrial order and actively litigated at trial; and that such issue was properly decided by the court below. Finally, National Cement argues that it is entitled to the $21,940.60 awarded it against PSI under theories of quantum meruit and unjust enrichment.

## III. THE EXTENT TO WHICH NATISCO ACQUIRED RIGHTS IN SCRAPER 31811 THROUGH THE SECOND SALE

Both ASCI and National Cement trace their claims in this case through the second sale of the Scraper to NATISCO: National Cement claims as assignee of NATISCO's rights in the Scraper, and ASCI claims as secured creditor of first NATISCO, then

National Cement. If NATISCO acquired no rights in Scraper 31811 through the second sale, then its assignee, National Cement, has no rights in the Scraper, either.[6] Similarly, if NATISCO acquired no rights through the second sale, ASCI holds no valid security interest in Scraper 31811, because under section 9–204(1), a debtor must have rights in the collateral before his creditor's security interest can attach to that collateral. The key to this lawsuit, then, lies in determining what rights NATISCO acquired in the second sale.

As will be discussed in more detail below, there are three theories under which NATISCO could have acquired rights in Scraper 31811 through the second sale. It is impossible to tell from the district court's opinion which theory the district court applied in reaching the conclusion that NATISCO acquired such rights. But a necessary prerequisite to the application of any of the three theories was a determination of who, immediately prior to the second sale, was the owner of Scraper 31811 for purposes of the Uniform Commercial Code. The district court did not explicitly state who the owner was, but it did explicitly find who the owner was *not*: that is, the court explicitly found that PSI had only a purchase money security interest, rather than an outright ownership interest, in Scraper 31811 immediately prior to the second sale.

For the reasons set forth below in part III–*A* of this opinion, we hold that this finding of the district court was clearly erroneous under Fed.R.Civ.P. 52(a). We therefore must reverse the district court's judgment. But even though this holding narrows and considerably simplifies the analysis necessary to resolve the conflicting claims of the parties in this case, the ultimate disposition of the case must turn on other questions of disputed fact that the district court has not yet answered. While this court may draw certain legal conclusions from undisputed facts, we cannot resolve disputed issues of fact at this level. Accordingly, we must remand the case for resolution of those disputed factual issues.

**6.** *See* UCC § 2–403(1), discussed in another context *infra* in part III–*B*.

Section 2–403 of the UCC is the statutory source of whatever rights in Scraper 31811 that NATISCO may have acquired in the second sale. Section 2–403 deals with three related topics: the general powers of a transferor or his agent to transfer title to goods; the title obtained by a good faith purchaser of goods for value; and the title obtained by a buyer of goods in ordinary course of business from a merchant to whom the goods have been entrusted. In the interests of judicial economy, we set out below in parts III–*B*, III–*C*, and III–*D* certain legal conclusions that must flow under each of these theories of title acquisition from certain undisputed facts in the record before us; we also set out the legal conclusions that would follow from each of the possible resolutions of the remaining disputed issues of fact that must be addressed by the district court on remand.

*A. Was the PSI–ICC Lease a "True Lease" or a "Lease Intended for Security"?*

The drafters of article nine of the UCC expressly provided in section 9–102(1)(a) that the scope of article nine includes all transactions, regardless of their form, that are "intended to create a security interest in personal property or fixtures." To this end, section 9–102(2) provides that article nine "applies to security interests created by contract including . . . lease[s] . . . intended as security." The inclusion of specific reference to leases intended as security was to make clear that article nine applied to transactions that, while disguised as leases, were in effect sales or conditional sales from the "lessor" to the "lessee."

The Code provides the following definition of "security interest" in section 1–201(37):

"Security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation. The retention or reservation of title by a seller of goods notwithstanding

shipment or delivery to the buyer (section 2–401) is limited in effect to a reservation of a "security interest." . . . Unless a lease . . . is intended as security, reservation of title thereunder is not a "security interest" . . . . Whether a lease is intended as security is to be determined by the facts of each case; however, (1) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (2) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

The question of whether particular transactions in the form of leases are "true leases" or "leases intended as security" is one of the most hotly litigated topics in commercial law. *See* J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code § 22–3, at 878 (2d ed.

1980). *See generally id.* at 877–83; R. Henson, Handbook on Secured Transactions Under the Uniform Commercial Code § 3–12, at 28–31 (1973); Coogan, *Leases of Equipment and Some Other Unconventional Security Devices: An Analysis of UCC Section 1–201(37) and Article 9*, 1973 Duke L.Rev. 909; Annot., *Equipment Leases as Security Interests Within Uniform Commercial Code § 1–201(37)*, 76 A.L.R.3d 11 (1977 & 1980 Supp.).

There is a considerable conflict among the various jurisdictions that have interpreted these provisions of the UCC, and there is comparatively little on the topic from the Alabama courts (whose interpretation we are bound to apply, insofar as such interpretation may be discerned). The only case that we have discovered in which the Alabama Supreme Court has discussed the topic is *Commerce Union Bank v. John Deere Industrial Equipment Co.*, 387 So.2d 787, 29 UCC Rep. 1326 (Ala.1980).[7] Unfor-

---

7. The distinction between "true leases" and "leases intended for security" arose in a peculiar context in *Commerce Union Bank.* Alabama Forest Resources, Inc. gave the Bank a security interest in Forest's after-acquired property, and the Bank filed a financing statement in December 1976. On August 10, 1978, Forest leased equipment from Deere, with an option to purchase included in the contract. Forest exercised the option to purchase on September 11, 1978, and on September 21, 1978, Deere filed a financing statement that claimed a purchase money security interest in the equipment. Forest went bankrupt, and the court was presented with the question of which security interest in the property had priority. Under section 9–312(4), Deere's purchase money security interest would prevail over the Bank's security interest in Forest's after-acquired property, even though the Bank had filed first, so long as Deere's filing was within 10 days of Forest's receipt of the collateral. Thus, the question arose whether Forest had received the collateral, for purposes of section 9–312(4), on August 10 (the time of the lease) or on September 11 (the time Forest exercised the purchase option); if the latter, Deere's purchase money security interest would prevail. The Bank took the position that the August 10 lease was not a true lease, but a disguised sale.

The court disagreed, holding that the August 10 lease was a true lease, and that Forest had not "received" the collateral until September 11. The court adopted from *In re Alpha Creamery Co.*, 4 UCC Rep. 794, 797–98

(Bkrpcy.W.D.Mich.1967), the following indicia for distinguishing a true lease from a disguised sale:

1. The facts in each case control to show intention of the parties to create a security interest.

2. Reservation of title in a lease or option to purchase appurtenant to or included in the lease does not in and of itself make the lease a security agreement.

3. [A l]ease agreement which permits the lessee to become the owner at the end of the term of the lease for a nominal or for no additional consideration is deemed intended as a security agreement as a matter of law.

4. The percentage that option purchase price bears to the list price, especially if it is less than 25%, is to be considered as showing the intent of the parties to make a lease as security.

5. Where the terms of the lease and option to purchase are such that the only sensible course for the lessee at the end of the lease term is to exercise the option and become the owner of the goods, the lease was intended to create a security interest.

6. The character of a transaction as a true lease is indicated by:

(a) Provision specifying purchase option price which is approximately the market value at the time of the exercise of the option.

(b) Rental charges indicating an intention to compensate lessor for loss of value over the term of the lease due to aging, wear and obsolescence.

tunately, however, *Commercial Union Bank* in largely inapposite, for it deals only with those instances in which there is an express option to purchase provided the "lessee" under the terms of the "lease." There is no evidence of such an option in the case at bar.

While a large number of courts from other jurisdictions have held that the absence of an explicit option to purchase as part of the lease negates the possibility that the lease is intended for security,[8] this court, in interpreting Alabama law, has held that "[j]ust as the *inclusion* of an option to purchase does not in and of itself make the lease one intended for security[,] so also, the *exclusion* of such an option does not ipso facto make it a 'pure lease.'" *In re Tillery*, 571 F.2d 1361, 1366, 23 UCC Rep. 1335, 1342 (5th Cir. 1978) (interpreting Alabama law) (per curiam, adopting opinion of bankruptcy judge) (emphasis in original). The contract at issue in *Tillery* explicitly provided that the "lessee" was to acquire no right to or title in the equipment, and the "lessee" did not have an option to purchase. We held that this was not determinative, however, because other provisions in the lease made clear that the *effect* of the lease was to create an equity or beneficial inter-

(c) Rentals which are not excessive and option purchase price which is not too low.

(d) Facts showing that the lessee is acquiring no equity in leased article during the term of lease.

387 So.2d at 790, 29 UCC Rep. at 1439–40.

In applying these factors, the court noted that a cursory examination of the rental agreement might indicate a conditional sale was intended: Forest was liable for the full rent over the "guaranteed minimum rental period"; 91% of the rental payments previously made could be applied to the purchase price under the option; and Forest indemnified Deere for damage or loss of the equipment to a considerable extent. But the court concluded that on balance, the rental agreement was a true lease: although there was a blank for it in the form rental agreement, there was no guaranteed minimum rental period designated, which meant that Forest could cancel at any time; the lease did not explicitly express an intention to create a security interest; and there was no conclusive evidence that Forest could become the owner of the equipment for nominal consideration. The court also looked beyond the terms of the rental agreement, noting that the price paid by Forest when it exercised the option was more than the option price specified in the rental agreement: "The seeming renegotiation of the purchase price further indicates the intent of the parties to enter into two separate transactions—first a lease, then a purchase agreement." 387 So.2d at 791, 29 UCC Rep. at 1441.

**8.** *E. g., Lease Finance Inc. v. Burger,* 40 Colo. App. 107, 575 P.2d 857, 23 UCC Rep. 1309 (1977); *Rushton v. Shea,* 419 F.Supp. 1349, 1364–67, 23 UCC Rep. 273 (D.Del.1976); *Rollins Communications, Inc. v. Georgia Institute of Real Estate, Inc.,* 140 Ga.App. 448, 231 S.E.2d 397, 20 UCC Rep. 1027 (1976); *Leaseamerica Corp. v. Kleppe,* 405 F.Supp. 39, 18 UCC Rep. 1054 (N.D.Iowa 1975) (finding true lease despite later, separate offer to sell to

lessee for a nominal sum; option agreement must exist at the time lease is entered into in order to find disguised sale); *McGuire v. Associates Capital Services Corp.,* 133 Ga.App. 408, 210 S.E.2d 862, 16 UCC Rep. 487 (1974); *In re Lockwood,* 16 UCC Rep. 195 (Bkrpcy.D.Conn. 1974); *In re DeVita Fruit Co.,* 473 F.2d 585, 12 UCC Rep. 1 (6th Cir. 1973) (applying Ohio law); *Sanders v. Commercial Credit Corp.,* 398 F.2d 988, 5 UCC Rep. 631 (5th Cir. 1968) (applying Georgia law); *In re Overbrook & Barson's, Inc.,* 5 UCC Rep. 546 (U.S.D.C.E.D.Pa.1968); *Sanders v. National Acceptance Co. of America,* 383 F.2d 606, 4 UCC Rep. 793 (5th Cir. 1967) (applying Georgia law). *See also* R. Henson, *supra,* at 30 ("if there is absolutely no option to purchase the goods, there is no basis in the Code for finding a security interest even though the lease extends over the probable useful life of the goods").

A few courts have found that a lease was intended as a disguised sale, with title retained for security, in situations in which there was no express option to purchase granted, but there was either an implicit agreement or a pattern and practice to the effect that the "lessor" would sell or abandon the "leased" goods. *E. g., FMA Financial Corp. v. Pro-Printers,* 590 P.2d 803, 25 UCC Rep. 950 (Utah 1979); *Appleway Leasing, Inc. v. Wilken,* 39 Or.App. 43, 591 P.2d 382, 26 UCC Rep. 209 (1979).

And, of course, the cases are legion in which courts have found true leases despite the existence of an option (usually because there was a substantial sum required for purchase at the end of the lease term). *E. g., Gibreal Auto Sales, Inc. v. Missouri Valley Machinery Co.,* 186 Neb. 763, 186 N.W.2d 719, 9 UCC Rep. 121 (1971); *In re Universal Medical Services, Inc.,* 8 UCC Rep. 614 (Bkrpcy.E.D.Pa.1970); *In re Falco Products Co.,* 5 UCC Rep. 264 (Bkrpcy.E.D. Pa.1968); *In re Alpha Creamery Co.,* 4 UCC Rep. 794 (Bkrpcy.W.D.Mich.1967); *In re Wheatland Electric Products Co.,* 237 F.Supp. 820, 2 UCC Rep. 486 (W.D.Pa.1964).

est in the "lessee." Specifically, the lease provided that if the contract ran for its full term, the "lessee" would owe the "lessor" the depreciated value of the property, offset by the amount received by the "lessor" upon the wholesale disposition of the property; if the proceeds received upon disposition exceeded the depreciated value, the "lessee" was to receive the surplus. Reading this equity-creating provision in conjunction with the other indicia of a disguised sale that were present,[9] we agreed with the bankruptcy judge's conclusion that the parties had intended that the lease be one for security, rather than a pure lease.

 In the case at bar, the district court articulated three factors as support for its conclusion that the PSI–ICC Lease was a lease intended for security (*i. e.*, a disguised

sale with only a security interest retained by PSI). The first factor was that PSI was obligated to guarantee ICC's purchase of mining equipment under the March 1974 "Guaranty Agreement." The Guaranty Agreement did not, however, require PSI to purchase equipment and then resell it to ICC. Both the language of the Guaranty Agreement and the testimony in the case regarding the circumstances under which the Scraper was purchased indicate that the purchase was not made directly pursuant to PSI's obligations under the Guaranty Agreement.[10] The Guaranty Agreement tells us only that PSI, ICC, and VERCO had certain contractual dealings whose structure was different from the contractual dealings between them with regard to the Scraper. That both the Scraper transactions and the transactions under the Guar-

---

**9.** The "lessee" in *Tillery* was required to: (1) pay "sales tax"; (2) provide comprehensive insurance on the full value of the equipment; (3) pay all taxes and fees imposed on the equipment's use; (4) assume the full risk of loss of the equipment; and (5) pay a "security deposit" that was equivalent to a down payment on the purchase price of the equipment.

**10.** Tanner testified (tr. 398–99) that the Guaranty Agreement did not contemplate an actual purchase of equipment by PSI, but that PSI agreed to make the outright purchase in keeping with its general responsibilities to ensure that VERCO had the equipment necessary to operate profitably.

Mautner testified to the same effect (tr. 700). He also testified that PSI intended that the rental payments from ICC to PSI should cover the purchase price of the Scraper plus interest and the 3% commitment fee that PSI would have received had the transaction fallen within PSI's contractual obligations under the Guaranty Agreement (tr. 706). Yet it is clear from Mautner's testimony that he, at least, did not believe that ICC or VERCO would acquire the right to retain the Scraper upon payment of the full amount of rentals; *i. e.*, he viewed as being very significant the fact that PSI had purchased the Scraper outright, rather than guaranteeing ICC's purchase of a scraper. On cross-examination by counsel for ASCI, Mautner testified as follows:

Q. I believe you first said that it was not—it was the intent to have Vulcan Energy pay the purchase price, the finance charge and the commitment fee for the machine?
A. Yes.
Q. You didn't want them to have to pay twice for the machine, did you?
A. No.

Q. And they paid as much—they paid more than the purchase price for the machine under this royalty arrangement, did they not, prior to the time that it was sold—
A. Paid it to whom?
Q. To ICC?
A. But P.S.I. bought the machine.
Q. Vulcan Energy paid it up the line to ICC?
A. Yes.
Q. All right. Paid more than the purchase price of the machine prior to the time it was sold to Vulcan Machinery?
A. But P.S.I. bought the machine.
(Tr. 706–07.) Counsel for ASCI was clearly attempting to get Mautner to admit that PSI had already received an amount in excess of the aggregate rentals due under the PSI–ICC Lease; no doubt counsel intended that this admission would lay the predicate for a finding that PSI's "purchase money security interest" had lifted because the debt that the security interest secured had been satisfied. But this line of questioning assumed that PSI's interest in the Scraper *was* only a security interest, rather than an outright ownership interest. Mautner obviously did not share that assumption, as evidenced by his inability to grasp counsel's questions.

Accordingly, we can find little in this testimony to support the proposition that PSI's acquisition of the Scraper was made directly pursuant to its obligations under the Guaranty Agreement, or that PSI otherwise intended that ICC or VERCO would, in effect, have purchased the Scraper upon completion of the rental payments.

anty Agreement were prompted by the same need—*i. e.*, to obtain mining equipment for VERCO's use—provides only marginal support, if that, for the proposition that the parties intended the business effect of those separate transactions to be identical.

■ The second factor cited by the district court was that PSI filed a financing statement showing the Scraper as collateral to secure ICC's and VERCO's debts to PSI. The courts of some jurisdictions have treated such a filing as a permissible factor in the determination of whether a lease is intended for security.[11] To our knowledge, however, no Alabama court has done so; therefore, we must attempt to predict whether the Alabama courts would include this among the list of factors to be considered.

We note that the 1972 amendments to the UCC added a new section to the uniform act. Section 9–408 provides as follows:

A consignor or lessor of goods may file a financing statement using the terms "consignor," "consignee," "lessor," "lessee" or the like instead of the terms specified in Section 9–402. The provisions of this Part shall apply as appropriate to such a financing statement *but its filing shall not of itself be a factor in determining whether or not the consignment or lease is intended as security* (Section 1–201(37)). However, if it is determined *for other reasons* that the consignment or lease is so intended, a security interest of the consignor or lessor which attaches to the consigned or leased goods is perfected by such filing.

11. *See BVA Credit Corp. v. Fisher*, 369 So.2d 606, 26 UCC Rep. 795 (Fla.App.1978); *Computer Sciences Corp. v. Sci-Tek, Inc.*, 367 A.2d 658, 21 UCC Rep. 859 (Del.Super.1976); *General Electric Credit Corp. v. Castiglione*, 142 N.J.Super. 90, 360 A.2d 418, 19 UCC Rep. 705 (1976).

12. Comment 2 provides, in pertinent part, as follows:

If a lease is actually intended as security (Section 1–201(37)), this Article applies in full. But this question of intention is a doubtful one, and the lessor may choose to

(Emphasis added.) The Draftsmen's Statement of Reasons for the 1972 adoption of this new section notes that "[f]iling of true leases which are not security interests (Section 1–201(37)) is not required; but because the question whether a lease is a true lease may be a close one, filing is permitted for leases." The Draftsmen's Comment to the 1972 official text is of like import.[12]

Alabama has not adopted the 1972 amendments to the uniform act. Nonetheless, we believe that if presented with the issue, the Alabama courts would follow the path taken by their sister state, Georgia, in *Rollins Communications, Inc. v. Georgia Institute of Real Estate, Inc.*, 140 Ga.App. 448, 231 S.E.2d 397, 20 UCC Rep. 1027 (1976). In *Rollins Communications*, the court noted that the lease at issue was clearly not one intended for security unless it was made one by the fact that the lease required the lessee to execute a financing statement listing the lessor as holding a security interest in the goods. The court noted that the treatment of leases varied substantially from state to state and from case to case, and held as follows:

It is our view that the lessor, faced with such uncertainty, should be permitted to make provisions for precautionary filing without the risk that such provisions would in and of themselves, as urged in the instant appeal, convert the lease into a secured transaction.

140 Ga.App. at 451, 231 S.E.2d at 399, 20 UCC Rep. at 1030–31. The court noted that it was, in effect, judicially adopting section 9–408 from the 1972 version of the UCC. *Id.*

We agree with Professors White and Summers that the rule of *Rollins Communi-*

file for safety even while contending that the lease is a true lease for which no filing is required. This section authorizes filing with appropriate changes of terminology, and without affecting the substantive question of classification of the lease. If the lease is a true lease, none of the provisions of the Article is applicable to the lease as an interest in the chattel.

Official Comment 2, UCC § 9–408 (1972 version).

*cations* is "the better view." J. White & R. Summers, *supra*, § 22–3, at 878 n.33. To hold otherwise would put the lessor who intends to create a true lease to an unfair choice: by filing, he would be admitting that he is not the owner of the property, but merely a secured party; but if he chooses not to file and a court should determine that his was not a "true lease," even his retained security interest would be unperfected. By sharp contrast, the *Rollins Communications* rule would encourage filing by prudent lessors, with the salutory result that a third party inquiring into the lessee's "title" would discover a claim adverse to such "title." [13]

Accordingly, the fact that the PSI–ICC Lease required ICC to execute a financing statement listing Scraper 31811 as "collateral," and the fact that PSI subsequently filed such a financing statement, provide no support for the district court's conclusion that the PSI–ICC Lease was one intended for security.[14]

The third factor that the court below cited in support of its conclusion that the PSI–ICC Lease was not a true lease was that PSI claimed to have only a security interest in the Scraper when it foreclosed against the property of VERCO, ICC, and ISCO in March 1976. There is, however, no support for this statement in the record. The only evidence of the interest PSI claimed to have at the time of the foreclosure was the sale agreement between PSI and Invesco (ASCI exh. 45). That document nowhere asserts that PSI had only a security interest in the Scraper; rather, it explicitly purports to cover both the property in which PSI had a security interest *and* the property that PSI owned but had leased to ICC, VERCO, or ISCO.

Further, even if PSI complied with the procedures required to foreclose on collateral subject to a security interest, that would not necessarily indicate that it believed itself to have only a security interest in the property. The requirements of notice, commercial reasonableness, and so forth under the Code are often more stringent than the default requirements of a lease contract; a prudent lessor might well believe it in his interests to comply with those more stringent requirements in order to guard against the possibility that a court might set aside the foreclosure upon a finding that his "lease" left him only a security interest in the property. For reasons analogous to those that support the *Rollins Communications* rule discussed above, we believe that the Alabama courts would not consider the "lessor's" compliance with the UCC's foreclosure requirements as probative evidence that the lease was one intended for security.

Accordingly, the third factor listed by the district court in support of its conclusion that the PSI–ICC Lease was one intended for security does not support that proposition, either. Thus, *none* of the three factors cited by the court actually support its conclusion on this issue.

National Cement and ASCI argue in their brief that we should sustain the district court's finding on this issue on alternative grounds. They point to these additional facts: the term of the lease was 84 months, and the aggregate payments were sufficient to amortize fully the purchase price of the Scraper plus interest at 15% per annum;

---

**13.** In this case, for example, had it been VERCO, ICC, or ISCO rather than Vulcan who sold the Scraper a second time, there is no question but that ASCI would have discovered that PSI held an adverse claim of some sort. But because VERCO, ICC, and ISCO did not appear to be parties to the second sale, ASCI did not initiate a search for financing statements evidencing their grant of a security interest in their equipment.

**14.** We note that Tanner testified that PSI's intent in filing the financing statements was sole-

ly to protect against the possibility that a court might characterize the PSI–ICC Lease as one intended for security; by filing, PSI ensured .that even if a court were so to characterize the lease, PSI's security interest in the Scraper would be perfected and thus entitled to priority over competing security interests. Tanner's testimony on this point was not contradicted. The facts of this case, then, present exactly the situation that compelled the Georgia court to adopt the *Rollins Communication* rule.

the lease payments included a 3% commitment fee similar to the fee payable under the Guaranty Agreement; PSI collected from Vulcan a 2% commission on the sales price that was customarily payable to the financier of such sales; the lease unconditionally obligated ICC to pay the total rental due over the term of the lease; and the lease placed upon ICC many other obligations customarily associated with installment sales transactions.

We agree with National Cement and ASCI that these factors, rather than the ones cited by the district court, would tend to support a finding that the PSI–ICC Lease was one intended for security. Nonetheless, certain *crucial* elements are lacking. There is no evidence whatsoever which would indicate that ICC had an option to purchase the Scraper for a nominal sum or would become the owner of the Scraper for no additional consideration at the conclusion of the lease. There is no evidence as to the useful life of the Scraper, and hence no evidence that could support an inference that PSI would abandon the Scraper at the end of the lease term. There is no evidence that ICC or VERCO would acquire any equity in the Scraper over the term of the lease.

█ By contrast, there is more than sufficient evidence to support precisely the opposite conclusion. Foremost is the express manifestation of the parties' intent in the lease itself: "[PSI] and [ICC] agree that this Lease is and is intended to be a true lease (and not a lease intended as a security or a lease in the nature of a security interest) and further agree to treat same as a true lease for all purposes ...." Such recitals are not conclusive according to *Tillery, supra*; yet *Tillery* does not authorize us to ignore them altogether unless the practical effect of other provisions in the lease is to refute such recitals. Further, PSI took the investment tax credit on the Scraper. Finally, it is significant that in the face of repeated and consistent testimony from witnesses for PSI to the effect that the parties intended a true lease,[9] no one directly testified that the parties intended the contrary.

In short, the evidence leads but to one conclusion: the practical effect of the PSI–ICC Lease was that PSI was to receive very favorable terms from its subsidiary during the life of the lease, and was to receive the Scraper back at the end of the lease; ICC was to acquire the use of the Scraper during the term of the lease, and nothing more. We hold that the district court's finding that the lease was one intended for security, within the meaning of sections 9–102(2) and 1–201(37), was clearly erroneous under Fed.R.Civ.P. 52(a). Therefore, as a matter of law, the PSI–ICC Lease was a true lease, and the interests of ICC and VERCO thereunder were merely those of lessees. PSI's interest in the Scraper at the time of the second sale was that of an owner rather than that of a secured party.

*B. The General Powers of a Transferor or the Actual or Apparent Agent of a Transferor to Transfer Title to Goods*

The first phrase of section 2–403(1) provides as follows: "A purchaser of goods acquires all title which his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased." Whatever NATISCO purchased from Vulcan was not a "limited interest," for NATISCO purported to buy, and Vulcan to sell, full title to the Scraper; the last phrase of this sentence from section 2–403(1), then, has no application to the case at bar.

█ Further, in this case it is undisputed that after the first sale of the Scraper to PSI in October 1974, Vulcan itself had no title whatsoever to the Scraper in its own right. (*E.g.*, tr. 226.) Thus, Vulcan had no power to transfer any title in its own right, unless the provisions of section 2–403(2) apply, as is discussed *infra* in part III–D. But the phrase "or had power to transfer" in section 2–403(1) makes clear that common-law concepts of agency and estoppel (based on actual or apparent authority) may be invoked by a party who purchases goods from an agent or apparent agent of the true owner.

The import of the testimony of both Losse and Pettyjohn was that PSI either actually authorized Vulcan to act as its agent in the second sale to NATISCO, or ratified Vulcan's actual authority after the second sale by its acquiescence while it waited for Vulcan to turn over the "replacement scraper" to VERCO. Tanner, Greenstein, and Mautner (PSI's counsel, treasurer, and chairman-president, respectively) vigorously testified to precisely the opposite effect. The issue of Vulcan's actual authority to act as PSI's agent in the second sale, then, was squarely joined at trial; but the district court did not resolve the issue. The direct conflict in testimony requires a credibility determination that this court is not authorized to make. The district court is directed to resolve that conflict as its first order of business on remand.

■ There is very little room in this case for a theory of apparent authority. Under Alabama law, "apparent authority" is such authority as a principal knowingly permits an agent to assume or holds him out as possessing; the agent's apparent authority must be based on the conduct of the principal and not that of the agent; and the burden of proving an agency rests upon the party asserting its existence. *E. g., Johnson v. Shenandoah Life Insurance Co.*, 291 Ala. 389, 394, 281 So.2d 636, 640 (1973). If Vulcan had actual authority to act as PSI's agent, apparent authority is irrelevant. If Pettyjohn knew that Vulcan had no actual authority to act as PSI's agent in selling the Scraper, NATISCO is charged with that knowledge as a matter of law under principles of imputed knowledge, discussed *infra* in part III–D, and cannot claim to have believed that Vulcan was validly acting as PSI's agent in the second sale. Only if both (1) Pettyjohn did not know that Vulcan was acting outside its authority, *and* (2) PSI gave NATISCO grounds to believe that Vulcan was entitled to operate as PSI's agent for purposes of selling the Scraper,

could PSI be bound under a theory of apparent authority. This is a question of fact, and we are unable to say that it is undisputed whether PSI provided NATISCO with such grounds. Therefore, the district court must address this factual issue on remand along with the issue of actual authority.

■ It is irrelevant whether Vulcan was acting as the agent of VERCO or ICC in the second sale. The power of an agent cannot exceed that of his principal, *e. g., Covington Electric Cooperative v. Alabama Power Co.*, 277 Ala. 162, 164, 168 So.2d 5, 7 (1964), and neither VERCO nor ICC had the power to transfer title in their own right since they were mere lessees from PSI. PSI cannot be bound under principles of agency law unless *it* conferred actual or apparent authority *on Vulcan* to act as its agent in the sale of Scraper 31811.[15]

If the district court finds that PSI conferred actual or apparent authority on Vulcan prior to the second sale, or that PSI ratified Vulcan's authority by knowing acquiescence after the second sale, then as a matter of law: (1) NATISCO acquired full, free, and clear title to the Scraper through the second sale; (2) National Cement succeeded to that title as NATISCO's assignee; (3) ASCI (through its assignment from Vulcan) acquired a valid, perfected purchase money security interest in the Scraper along with the contractual right to receive rental payments under the lease-purchase agreement; (4) PSI retained no rights in the Scraper; and (5) Invesco gained no rights in the Scraper through its purchase from PSI.

If, on the other hand, the district court finds that PSI neither conferred actual or apparent authority upon Vulcan prior to the second sale, nor ratified Vulcan's authority by its knowing acquiescence after the second sale, then as a matter of law: (1) NATISCO acquired *no rights in the Scraper* through the second sale (at least insofar as

**15.** On the topic of whether Tanner's, Greenstein's, or Mautner's knowledge of the second sale, if any, should be imputed to PSI for purposes of establishing PSI's acquiescence, see the discussion of imputed knowledge in part III–D of this opinion, *infra*, and especially note 17 *infra*.

those rights would derive through the first sentence in section 2–403(1), quoted above, but leaving aside for the moment the theories of title acquisition discussed in parts III–C and III–D, infra); (2) National Cement acquired no rights in the Scraper through its assignment from NATISCO; (3) ASCI acquired no valid security interest (perfected or unperfected, purchase money or otherwise) in the Scraper because its debtor never had rights in the collateral; (4) PSI retained good title to the Scraper, subject only to the PSI–ICC Lease; and (5) Invesco acquired good title to the Scraper through its purchase from PSI.

### C. NATISCO's Title as a Good Faith Purchaser of Goods for Value

■ Immediately after the language quoted above in part III–B of this opinion, section 2–403(1) provides, in pertinent part, as follows:

A person with voidable title has power to transfer a good title to a good faith purchaser for value. When goods have been delivered under a transaction of purchase the purchaser has such power even though:

. . . .

(d) The delivery was procured through fraud punishable as larcenous under the criminal law.

This is the general "good faith purchaser for value" rule of the UCC. Essentially, it provides that sale to a good faith purchaser for value cures the defects in the seller's "voidable" title; it cannot, however, cure "void" title. The distinction between "void" and "voidable" title, therefore, is crucial.

■ For the seller to have obtained even voidable title, he must have obtained delivery of the goods through "a transaction of purchase." While this phrase has been defined broadly by various courts, it is generally limited to those situations in which the party who delivered the goods to the subsequent seller intended, however misguidedly, that the seller would become the owner of the goods. Thus, the con artist who fraudulently induces a manufacturer to deliver goods to him by means of a forged check has voidable title because he obtained delivery through a transaction of purchase, even though the defrauded manufacturer could bring criminal charges against the con artist; under section 2–403(1), the defects in the con artist's voidable title would be cured by a sale to a good faith purchaser for value, and the good faith purchaser would obtain clear title, free from any claims of the manufacturer. But if the con artist merely converts the goods to his own use after having obtained possession of them in some manner other than through a transaction of purchase, he does not have even voidable title; instead, he has void title, and cannot pass good title even to a good faith purchaser for value. E. g., Allstate Insurance Co. v. Estes, 345 So.2d 265, 21 UCC Rep. 1032 (Miss.1977); Marvin v. Connelly, 272 S.C. 425, 252 S.E.2d 562, 26 UCC Rep. 370 (1979). See generally J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code § 3.11, at 140–42 (2d ed.1980). Cf. In re Sitkin Smelting & Refining, Inc., 639 F.2d 1213, 1215–17 (5th Cir. 1981) (under Alabama law, bailee cannot pass title to good faith purchaser for value under section 2–403(1); although bailee could conceivably have passed title to buyer in ordinary course under a section 2–403(2) entrustment theory, holder of security interest in bailee's after-acquired inventory could not, under section 1–201(9), be treated as a "buyer in ordinary course").

Applying these principles to the facts of this case, NATISCO could not have benefited from this portion of section 2–403(1), even assuming NATISCO was a good faith purchaser for value. There is no evidence in this case which could support a finding that Vulcan obtained possession of Scraper 31811 by means of a "transaction of purchase" with PSI prior to the second sale; thus, Vulcan itself did not have even "voidable" title at the time of the second sale, and section 2–403(1) could not cure any defects in any title NATISCO obtained directly from Vulcan.

Nor could NATISCO have obtained a "cured" title under the theory that Vulcan was acting as agent for a party with voidable title. If Vulcan was PSI's agent in the second sale, NATISCO obtained clear title without any need for the operation of this curative rule. The question remains whether Vulcan might have been acting as agent for ICC or VERCO: if either of those companies had voidable title, the defects in that title might have been cured by section 2–403(1). Our holding that ICC and VERCO were mere lessees of Scraper 31811, however, means that ICC and VERCO did not acquire even voidable title to the Scraper. Although one court has found that a conditional sale disguised as a lease constituted a transaction of purchase for purposes of section 2–403(1), *United Road Machinery Co. v. Jasper*, 568 S.W.2d 242, 24 UCC Rep. 610 (Ky.App.1978), a true lease is not a transaction of purchase and does not confer even voidable title upon the lessee. *E. g., McDonald's Chevrolet, Inc. v. Johnson*, 376 N.E.2d 106, 24 UCC Rep. 331 (Ind.App. 1978)(lessee had "void" title; thus, when he "sold" motor home to dealer, subsequent good faith purchaser for value from dealer acquired no title).

### D. NATISCO's Title as a Buyer in Ordinary Course from a Merchant to Whom the Goods Have Been Entrusted

The third theory under which NATISCO could have acquired rights in the Scraper through the second sale is based upon the language of sections 2–403(2) and 2–403(3). Like the good faith purchaser theory discussed above in part III–C of this opinion, ASCI and National Cement need not resort to this theory unless it is determined that Vulcan lacked actual or apparent authority to act as PSI's agent in the second sale. Sections 2–403(2) and 2–403(3) provide as follows:

> (2) Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business.

> (3) "Entrusting" includes any delivery and any acquiescence in retention of pos-session regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods have been such as to be larcenous under the criminal law.

For a buyer to acquire title to goods under these provisions, four issues must be addressed: (1) whether there was an entrustment; (2) whether the entrustee was a merchant dealing in goods of that kind; (3) what rights were transferred; and (4) whether the purchaser from the entrustee was a buyer in ordinary course of business.

Entrustment generally occurs in one of four standard fact patterns. In the first, the owner turns his goods over to a dealer who is to act as his sales agent; a buyer in ordinary course takes free of the owner's rights in the goods, and the owner is relegated to pursuing the dealer for the proceeds of the sale. In the second, a wholesaler delivers goods to a dealer on consignment or under a floor-planning agreement; a buyer in ordinary course is not bound by any "title retention" agreement between the dealer and the wholesaler as to the passage of title. In the third typical situation, the owner leaves goods with the dealer to be repaired; when the dealer sells the goods to a buyer in ordinary course, the buyer takes free of the owner's interests. The last situation occurs when an individual buys goods from a dealer but leaves them in the dealer's hands temporarily; again, a buyer in ordinary course takes free of the original purchaser's interests. *See generally* J. White & R. Summers, *supra*, § 3.11, at 143. The evidence in the case at bar does not seem to fit neatly within any one of these categories, but that does not necessarily mean that the true owner of Scraper 31811 prior to the second sale did not "entrust" the Scraper to Vulcan within the meaning of section 2–403(3). As Professors White and Summers point out, section 2–403(3)'s definition of entrustment to include "any delivery and any acquiescence in retention of possession" may support a finding of entrustment in situations other than

those listed above. *Id.* While some courts have strictly interpreted the requirements of "delivery" and "acquiescence," entrustment is a question of fact; this issue was hotly disputed at trial and the district court did not make a factual finding with regard thereto.

■ It is undisputed that Vulcan was a merchant dealing in goods of that kind within the meaning of section 2–403(2). The next inquiry, however, is more complicated. Section 2–403(2) provides that "all rights of the entruster" are transferred to a buyer in ordinary course, rather than providing that a buyer in ordinary course obtains free and clear title. For purposes of this case, this means that it is irrelevant if ICC or VERCO entrusted the Scraper to Vulcan, because they had no ownership rights therein and NATISCO could acquire no more than the rights of the entruster under this section. *See, e. g., Exchange Bank of Osceola v. Jarrett*, 588 P.2d 1006, 25 UCC Rep. 877 (Mont.1979)(debtor sold tractor-scraper to dealer in violation of security agreement between debtor and bank covering tractor-scraper as collateral; subsequent buyer in ordinary course from dealer did not take free of bank's security interest under section 9–307(1) because security interest was not created by its seller, the dealer; neither did buyer take free of bank's security interest under section 2–403(2), because while buyer acquired all rights of entruster-debtor, entruster-debtor's rights were subject to bank's security interest). Accordingly, ASCI and National Cement can prevail under this theory only if *PSI* were found to have entrusted the Scraper *to Vulcan*, for only PSI had ownership rights in the Scraper.

■ The last inquiry is whether NATISCO was a buyer in ordinary course. Section 1–201(9) defines "buyer in ordinary course of business" as

a person who in good faith and *without knowledge that the sale to him is in viola-*

*tion of the ownership rights or security interest of a third party in the goods* buys in ordinary course from a person in the business of selling goods of that kind but does not include a pawnbroker.

(Emphasis added.) Thus, to qualify as a buyer in ordinary course, NATISCO must have had no knowledge that the second sale was in violation of PSI's ownership rights in the Scraper. NATISCO, of course, was a joint venture between N C Mining and ISCO, two corporations. It is undisputed that neither N C Mining nor the corporation that was its parent at the time of the second sale, National Cement, had actual notice of PSI's conflicting rights in the Scraper. Nonetheless, if ISCO had actual knowledge at the time of the second sale, that knowledge is imputed to the joint venture. *See e. g., Potts v. Ellis*, 238 Ala. 155, 157, 190 So.73, 76 (1939)(knowledge acquired by one partner is imputed to the partnership).

"The only way to communicate actual notice to a corporation is through its agents. Thus, a corporation is held responsible for the knowledge acquired by its agents while acting within the scope of their employment." *Birmingham Boys' Club, Inc. v. Transamerica Insurance Co.*, 295 Ala. 177, 180, 325 So.2d 167, 169 (1976). "Whether the corporate officer or agent was possessed of actual knowledge of facts is ordinarily [a question] of fact for the jury. Whether the knowledge of, or notice to, an officer of a corporation is to be imputed to the corporation is a question of law for the court." 3 W. Fletcher, Cyclopedia of the Law of Private Corporations § 834, at 138 (rev.perm. ed.1975).

■ In this case, it is undisputed that Pettyjohn, at the time of the second sale, knew that Scraper 31811 had previously been sold to PSI. (*E.g.*, tr. 543–44.) If Pettyjohn knew also that the second sale was in violation of PSI's rights in the Scraper, then under familiar principles of agency law,[16] Pettyjohn's knowledge of that

---

**16.** "[T]he general rule is well established that a corporation is charged with constructive knowledge, regardless of its actual knowledge, of all material facts of which its officer or agent receives notice or acquires knowledge while acting in the course of his employment within

fact must be imputed as a matter of law to his corporate principals, Vulcan and ISCO, and through ISCO to the joint venture, NATISCO. Accordingly, NATISCO could not have been a buyer in ordinary course within the meaning of section 1–201(9) if Pettyjohn knew that the second sale was in violation of PSI's rights; if that be the case, neither ASCI nor National Cement could prevail under a section 2–403(2) entrustment theory.

■ Contrary to ASCI's and National Cement's assertion in their joint brief, however, if Pettyjohn knew that the second sale was in violation of PSI's rights, that knowledge cannot be imputed to PSI for purposes of establishing PSI's knowledge of or acquiescence in the second sale. While it is undisputed that Pettyjohn was not an officer or director of PSI, he did fill those capacities in both VERCO and ICC; under some circumstances, notice given a subsidiary may constitute notice to its parent corporation, at least when there is a sufficient nexus between the two. 3 W. Fletcher, *supra*, § 814.1, at 78. Such an argument is more compelling with respect to ICC than VERCO, for Pettyjohn, rather than PSI, had virtually complete control of VERCO on a day-to-day basis. Arguably, PSI had "such domination of ICC's finances, policies and practices that [ICC] ha[d], so to speak,

no separate mind, will or existence of its own and [was] but a business conduit for [PSI]." 1 W. Fletcher, *supra*, § 43 at 209. Yet a well established rule of imputed knowledge holds that

> where an officer is dealing with the corporation in his own behalf, or is, for any other reason, interested in a transaction adversely to the corporation, knowledge possessed by him in the transaction is not imputable to the corporation, even though the officer obtaining the knowledge was, at the time, the managing agent of the corporation, or even though the officer possessing the knowledge or having the notice attended the meeting at which the matter in question was considered . . . .

3 W. Fletcher, *supra*, § 819, at 90 (footnotes omitted). *See also id.* §§ 820, 821, 825, and 826. There can be no doubt but that Pettyjohn was interested in a transaction adversely to PSI if Vulcan's sale of the Scraper to NATISCO was made without authority from PSI. In short, if PSI made Vulcan its agent for the second sale, the question of whether Pettyjohn's knowledge of that sale should be imputed to PSI is irrelevant; if PSI did not make Vulcan its agent, Pettyjohn's knowledge, if any, that the second sale violated PSI's rights cannot be imputed to PSI for purposes of establishing PSI's

the scope of his authority, even though the officer or agent does not in fact communicate his knowledge to the corporation." 3 W. Fletcher, *supra*, § 790, at 12. "Where the officers and agents of two corporations are identical, each one is chargeable with notice of everything that comes to the knowledge of the common officers." *Id.* at 13.

"[K]nowledge acquired or possessed by an officer or agent of a corporation otherwise than in the course of his employment, or in relation to a matter which is not within the scope of his authority, is not notice to the corporation." *Id.* § 793, at 20. But "[a]n agent may also be put in such a position of general authority, in such a managerial or directing situation—as in the case of the chief officer of a corporation or of an individual—that notice to him will be notice to his principal because it must be deemed within his authority to receive it, even though he never personally acts in respect of the matters to which the notice relates." *Id.* at 21.

"Where the officer to whom notice is given or by whom knowledge is acquired is in effect

the corporation, the notice is generally imputed to the corporation. Thus, knowledge of one of the organizers of a corporation who is the principal stockholder and also director and treasurer has been held imputable to the company." *Id.* § 809, at 60–61. "It is the general rule that notice to and knowledge of the president of a corporation relating to its affairs and business is notice to and knowledge of the corporation, especially where he is in effect the company, or its chief stockholder, or where he is in effect the general manager." *Id.* § 811, at 67.

This question frequently "arises in connection with the question as to whether the corporation is a bona fide purchaser . . . of goods . . . ." *Id.* § 816, at 85. "[K]nowledge of fraud, perpetrated by a corporation in acquiring [property], will be imputed to another corporation to which it transfers [the property], where the officers acting for the transferee corporation are the same persons who as officers of the transferor carried out the fraud." *Id.* § 824, at 108.

acquiescence in the second sale, because Pettyjohn's knowledge would have come about through his participation in a transaction adverse to PSI's interests.[17]

Whether ASCI and National Cement can or cannot prevail on a section 2–403(2) entrustment theory turns on questions of disputed fact—*i.e.*, whether PSI entrusted the Scraper to Vulcan, and whether Pettyjohn knew that the second sale was in violation of PSI's rights. The district court has made no findings on these disputed factual issues, but should do so upon remand. Should the court find that ASCI has proved the facts necessary to this section 2–403(2) entrustment theory, the legal consequences would be the same as if PSI had made Vulcan its agent for the second sale, as discussed above in part III–*B*.

## IV. CONCLUSIONS

Our holding in part III–*A* above that the PSI–ICC Lease was a true lease rather than a lease intended as security means that the judgment of the court below must be reversed. Therefore, we need not reach PSI's other arguments on appeal. Because PSI was the owner of the Scraper at the time of the second sale rather than merely a holder of a security interest therein, much of the district court's article nine analysis becomes inapplicable, as does ASCI's and National Cement's theory that PSI subordinated its security interest in the Scraper to that of ASCI. Whether PSI benefited from VERCO's allegedly excessive royalty payments to ICC becomes irrelevant as well. Similarly, for the reasons set forth in part III–*C* above, our holding that PSI was the owner of the Scraper at the time of the second sale means that ASCI and National Cement cannot recover under the theory that NATISCO's good faith purchase for value, without more, passed title under section 2–403(1).

On remand, ASCI and National Cement could yet prevail under their alternate theories of how NATISCO acquired rights in the Scraper—*i.e.*, their theories of agency/estoppel and section 2–403(2) entrustment, discussed in parts III–*B* and III–*D* above. But the validity of such theories as applied to this case depends upon the answers to questions of disputed fact that have not yet been resolved by the trial court; accordingly, we must reject ASCI's and National Cement's invitation to affirm on these "other grounds." Finally, the *quantum meruit* award to National Cement against PSI was based on the premise that National Cement was entitled to possession of the Scraper during the period it was in the possession of PSI and Invesco; our holding today means that that premise may be incorrect. Accordingly, that award must be reversed along with the award of the escrowed proceeds from the sale of the Scraper. Such a *quantum meruit* recovery would be proper on remand only upon a finding that National Cement was *legitimately* entitled to possession of the Scraper during the period it was held by PSI and Invesco—*i.e.*, upon a finding that NATISCO obtained rights in the second sale.

Since this case was tried before the court rather than to a jury, we leave to the discretion of the district court the extent and nature of the proceedings that are to be held upon remand.

REVERSED and REMANDED.

---

17. Of course, this does not affect the determination of whether Tanner, Greenstein, or Mautner had actual knowledge of the second sale before or after the fact, and if so, whether their knowledge should be imputed to PSI for purposes of establishing PSI's acquiescence in the second sale. Because their knowledge would not have come about through their participation in a transaction adverse to PSI's interests, the normal rules of imputed knowledge (see note 16 *supra*) would apply.