## In re SUNBEAM SECURITIES LITIGATION.

### No. 98–8258CIV.

United States District Court, S.D. Florida.

Dec. 10, 1999.

Robert M. Kornreich, Chet B. Waldman, and Carl L. Stine of Wolf Popper LLP, New York, NY, Leonard Barrack, Gerald J. Rodos, M. Richard Komins, and Sara Jones Biden of Barrack, Rodos & Bacine, Philadelphia, PA, Julian H. Kreeger, Sharon Levine Mirsky, and Abraham Rappaport of Milberg Weiss Bershad Hynes & Lerach LLP, Boca Raton, FL, Merrill G. Davidoff, Lawrence Deutsch, Robin Switzenbaum, and Jill E. Sterbakov of Berger & Montaque, P.C., Philadelphia, PA, Michael J. Pucillo and Wendy H. Zoberman of Burt & Pucillo, LLP, West Palm Beach, FL, and Peter H. Rachman and Emily C. Komlossy of Goodkind Labaton Rudoff & Sucharow LLP, Fort Lauderdale, FL, for plaintiffs.

Richard Berman, Katz Barron Squitero & Berman, Miami, FL, for Albert J. Dunlap, Russell A. Kersh, Donald R. Uzzi, defendants.

Thomas Meeks, Zuckerman Spaeder Taylor & Evans, Miami, FL, for Arthur Anderson LLP, defendant.

Sara Sotto, Fowler, White, Burnett, et al., Miami, FL.

Peter W. Bellas, Zelle & Larson, Minneapolis, MN.

Robert E. Zirnet, Skadden, Arps, Slate, Meagher & Flom, New York, NY, for William T. Rutter, Howard G. Kristol, Charles M. Elson, Peter A. Langerman, Faith Whittlesey, defendants.

David Wells, McGuire, Woods, Battle & Boothe, Jacksonville, FL, for Robert J. Click, defendant.

Brian Roaner, New York, NY.

Howard K. Coates, Jr., Proskauer Rose, Boca Raton, FL, for David C. Fannin, defendant.

David J. Hensler, Hogan & Hartson, Washington, DC.

Mark Bideau, Greenberg Traurig, West Palm Beach, FL, for Sunbeam Corp., defendant.

Steven Pesner, Akin Gump Strauss Haur & Feld, New York, NY.

## ORDER # 3

MIDDLEBROOKS, District Judge.

(On Motions to Dismiss)

THIS CAUSE comes before the Court upon the filing of the following motions to dismiss: (1) Defendants Sunbeam Corporation, William T. Rutter, Howard G. Kristol, and David C. Fannin's Motion to Dismiss Consolidated Amended Class Action Complaint; (2) Defendants Albert J. Dunlap and Russell A. Kersh's Motion to Dismiss Plaintiffs' Amended Class Action Complaint; (3) Defendant Donald R. Uzzi's Motion to Dismiss the Complaint; (4) Defendant Robert Gluck's Motion to Dismiss Consolidated Class Action Complaint; and (5) Defendant Arthur Anderson LLP's Motion to Dismiss Consolidated Class Action Complaint.

## I. Facts

Plaintiffs bring this action against Defendants Sunbeam Corporation, William T. Rutter, Howard G. Kristol, David C. Fannin, Albert J. Dunlap, Russell A. Kersh, Donald R. Uzzi, Robert Gluck, and Arthur Andersen LLP for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a) and Rule 10b–5 promulgated thereunder.[1] Plaintiffs assert this claim as a class action, on behalf of a class of all purchasers of Sunbeam common stock during the period beginning April 23, 1997 through and including June 30, 1998.[2]

### A. Background

For the purposes of these motions to dismiss, the Court takes the facts as alleged by Plaintiffs in the Consolidated Amended Class Action Complaint as true.[3] The background facts of the Section 10(b) and Rule 10b–5 claims are as follows. In July 1996, Sunbeam announced the hiring of Albert Dunlap as Chairman and Chief Executive Officer. Dunlap had gained a

---

**1.** As stated in the Complaint, Albert J. Dunlap was Sunbeam's Chairman of the Board and Chief Executive Officer from July 1996 until June 1998; Russell A. Kersh was Sunbeam's Executive Vice President, Finance and Administration, from July 1996 through June 1998; Donald R. Uzzi was Sunbeam's Executive Vice President, Worldwide Consumer Products, from January 1997 until April 1998; David C. Farmin was Sunbeam's Executive Vice President, General Counsel, from January 1994 until August 1998; Robert J. Gluck was Sunbeam's Vice President and Controller since February 1995 and was Chief Financial Officer since June 1998; William T. Rutter was, at all relevant times, the Chairman of Sunbeam's Audit Committee; Howard G. Kristol was, at all relevant times a member of the Audit Committee; Arthur Andersen, LLP, is a firm of certified public accountants who audited Sunbeam's financial statements during the class period.

**2.** The purported class includes all purchasers within the class period, with the exception of Defendants, non-Defendant officers and directors of Sunbeam, employees of Sunbeam, members of the immediate families of each of the Individual Defendants, and any entities which any of the Defendants has a controlling interest, and the legal representatives, heirs, successors, predecessors in interest, affiliates or assigns of any of the Defendants.

**3.** Accordingly, the Court will dispense with the use of "allegedly" in the following narrative of facts.

reputation among corporate and investing circles as a "turnaround specialist," and his hiring was perceived as a commitment by Sunbeam increase its shareholder value. Upon his arrival at Sunbeam, Dunlap announced the formation of a new management team and the formulation of a dramatic restructuring plan to help boost falling revenues.

On July 24, 1996, Sunbeam announced its second quarter results which reflected a 36.8 percent drop in profits on a 12 percent gain on sales. For the three months ended June 30, 1996, net earnings were $7.2 million compared to $11.4 million for the comparable period of 1995. On July 31, 1996, Sunbeam announced the formation of a Senior Operating Committee to manage the company, consisting of Dunlap, Russell Kersh, P. Newton White, and David Fannin. The market reacted favorably to Sunbeam's announcements and Sunbeam common stock closed at $19.25 per share on July 31, 1996, up 50% from $12.25 per share on July 17, 1996.

On October 23, 1996, Sunbeam issued a press release announcing its results for the quarter ended September 30, 1996. The company reported sales of $244.9 million, 2% below third quarter 1995 sales. Net loss per share was $0.22, compared with earnings of $0.11 reported for the same period the previous year. In commenting on these results, Dunlap stated that the poor results reflected the need for a new corporate strategy and that he and his management team were focusing on creating a restructuring plan for Sunbeam.

On November 12, 1996, Sunbeam issued a press release announcing the details of this restructuring plan. The restructuring plan called for the divestiture of several lines of business, and a focus on new core product categories. The plan also called for a consolidation of administrative functions and the sale or consolidation of 39 of Sunbeam's 53 facilities. The restructuring also included the consolidation of Sunbeam's divisional and regional headquarters into a single worldwide corporate headquarters in Delray Beach, Florida.

In addition to the consolidation of Sunbeam's facilities, the restructuring plan also included reducing headquarters personnel from 308 persons to 123 persons. The plan also included consolidating specific back office administrative functions, including certain finance, risk management, and customer service operations, into Sunbeam's Hattiesburg manufacturing facility. The total headquarters and administrative consolidations would result in a 50% company-wide reduction of administrative personnel, from approximately 1,400 to 700. In conjunction with the implementation of the restructuring plan, Sunbeam announced that it expected to record a one-time, pre-tax special charge of approximately $300 million, only 25% of which would impact cash through the payment of costs associated with the rationalization of the massive downsizing. The remaining 75% of the charges were purported to be non-cash in nature, consisting primarily of asset and inventory write-downs, losses anticipated to be incurred from divestiture, and increases in several reserve categories.

On January 29, 1997, Sunbeam announced its results of operations for the quarter and year ended December 29, 1996. Sunbeam reported net sales for the quarter of $268.8 million, down from the $284.1 million reported in the same period of the prior year. Sunbeam also reported a net loss for the quarter of $234.8 million, or $2.83 per share, compared with break-even earnings from the same period of the prior year. Sunbeam reported a net loss for the year of $228.3 million, or $2.75 per share, compared with earnings of $50.5 million the prior year.

On March 31, 1997, Sunbeam filed its Form 10–K for 1996, which reiterated the previously announced results of operations for 1996. The Form 10–K was signed by defendants Dunlap, Kersh, Gluck, and Kristol. Sunbeam stated in the Form 10–K that the not loss in 1996 was due, in large part, to the effects of a $337.6 million pre-tax charge, which was necessary to

implement the restructuring plan. As was later revealed, the amount of the restructuring fee was overstated because it included: (1) costs that were required by generally accepted accounting principles (hereinafter "GAAP") to be included in future periods; and, (2) items that were not special charges related to restructuring. The pre-tax charge, as later restated by Sunbeam, actually was $239.2 million, close to $100 million less than Sunbeam represented on its Form 10–K.

## B. Summary of Cause of Action

Plaintiffs allege that by April 23, 1997, the start of the class period, Defendants knew or recklessly disregarded that the one-time restructuring charge listed on the 1996 Form 10–K was overstated in excess of $90 million. Plaintiffs further allege that these overstated charges created reserves that Sunbeam fraudulently used to boost its 1997 financial results. Plaintiffs allege that during the class period, Defendants issued a series of materially false and misleading statements in press releases, at analyst conferences, and in filings with the Securities and Exchange Commission which were intended to give, and did give, the false impression that the highly touted restructuring and growth plan had resulted in a successful corporate turnaround, and that throughout the class period, Defendants engaged in a plan, scheme and common course of conduct to inflate the market price of Sunbeam common stock by misstating and/or concealing material information concerning Sunbeam's true financial condition, results of operations, and future business prospects.

Plaintiffs further allege that as a result of the misrepresentations by Defendants, the price of Sunbeam common stock was artificially inflated during the class period, and analysts continued to issue "buy" ratings. During the class period Sunbeam's stock price fluctuated from a high of $52 per share in early March 1998 to a low of $8 13/16 per share on June 22, 1998, closing at $10 7/16 per share on June 30, 1998, the close of the class period. Plaintiffs purchased Sunbeam common stock relying

upon the integrity of the market price and market information relating to Sunbeam, and have been damaged thereby.

## C. Facts Pled Specifying Fraudulent Misrepresentations and Scienter

Plaintiffs allege the following materially false and misleading statements or omissions, including with each the explanation of why such statements were misleading.

(1) An April 23, 1997 press release announcing Sunbeam's results for the first quarter ended March 31, 1997. Sales for the quarter were reported as $253.5 million and earnings per share were reported as $0.24.

(2) Sunbeam's Form 10–Q for the first quarter 1997, filed on May 14, 1997, which reiterated the results of operations contained in the April 1997 press release.

(3) Statements by Dunlap and a press release from Sunbeam denying allegations of accounting fraud published in a June 14, 1997, *Barron's* article by Jonathan R. Laing entitled "High Noon at Sunbeam: Does Chainsaw Al have a truly revived operation—Or something else—in his sights." In this article Laing suggested that the restructuring charge taken in the fourth quarter of 1996 raised quality-of-earnings issues going forward. As Laing reported, Sunbeam denied any wrongdoing, and according to a July 1, 1997 Paine Webber report, Dunlap dismissed the allegations as propaganda stirred up by "shorts."

(4) A July 23, 1997 press release announcing Sunbeam's results of operations for the second quarter 1997. Sales for the quarter were reported as $287.6 million, and earnings per share were reported as $0.30. On a year-to-date basis, the reported revenue of $541.1 million was 12% above 1996 and earnings per share from continuing operations of $0.54 were 391% above the $0.11 reported in 1996.

(5) Sunbeam's Form 10–Q for the second quarter of 1997, filed on July 23, 1997, which reiterated the previously announced results of operations in the April 1997 and July 1997 press releases.

(6) A statement by Dunlap in an August 10, 1997 *New York Times* article that "in the twelve months since I have been at Sunbeam, [shareholder value] has risen by $2.4 billion."

(7) A statement by Dunlap in an August 21, 1997 CNN interview that "we've completed the restructuring phase. We are not into the growth phase. We are into the refinement phase." Dunlap also commented on analyst reports regarding Sunbeam stating " . . . if you read all the analyst reports I haven't read one that didn't have a glowing report on Sunbeam."

(8) An October 22, 1997 press release announcing Sunbeam's results of operations for the third quarter on 1997. Sunbeam reported sales of $289 million, a 25% increase over the $231.8 million reported in the same period for 1996. Sunbeam reported income from continuing operations of $34.6 million, or $.039 per share. In the October press release Dunlap is quoted as stating "this is the first time in the Company's history that it has consistently achieved double-digit sales growth, each quarter, without an acquisition."

(9) Sunbeam's Form 10–Q for the third quarter of 1997, filed on October 24, 1997, which reiterated the previously announced 1997 quarterly results of operations specified in the April 1997, July 1997, and October 1997 press releases.

(10) Statements by Dunlap in an October 27, 1997 *Wall Street Transcript* article that reiterated the previously announced 1997 quarterly results of operations specified in the April 1997, July 1997, and October 1997 press releases.

(11) Based on public statements and SEC filings, the following analyst reports on Sunbeam were issued; an October 22, 1997 report by CIBC Oppenheimer that raised its one-year target price for Sunbeam common stock to $58–$60 per share; an October 24, 1997 report by Merrill Lynch Capital Markets that estimated fourth quarter earnings per share of $0.48; an October 30, 1997 report by Prudential that reiterated its "buy" rating; a October 28, 1997, report by Paine Webber raising Sunbeam to "buy" from "attractive;" a November 21, 1997 report by Bear, Stearns which reiterated a "buy" rating; a December 10, 1997 report by Oppenheimer listing Sunbeam as a "strong buy;" and a January 14, 1998 report by Prudential reinstating Sunbeam as a "buy."

(12) Statements by Uzzi in a December 29, 1997 interview with *Bloomberg News* regarding the reasons for Sunbeam's 1997 sales increases. Uzzi stated that "all of our businesses' sales are up in the double digits this year, which is a result of us going back and determining the appropriate positioning for the products."

(13) A January 28, 1998 press release announcing Sunbeam's financial results for the fourth quarter and year ended December 28, 1997. Sunbeam reported net sales for the quarter of $338.1 million, up approximately 26% from the $268.9 million reported in the same period of 1996. Sunbeam reported net income for the quarter of 41.7 million, or $.049 per share. Sunbeam reported net sales for the quarter of $1,168.2 million. Sunbeam reported income from continuing operations of $123.1 million, or $1.45 per share.

(14) Statements by Dunlap in the January 1998 press release that touted the dramatic turnaround such as, "we experienced sales growth in all major channels of distribution, in all regions of the world and in each of our five

global businesses," and, "we set a three year goal to have 20% operating margins, and were essentially at that level in the 3rd and 4th quarters this year."

(15) A statement by Dunlap during a January 28, 1998 interview on the Cavuto Business Report that the lower than predicted fourth quarter earnings were a "temporary aberration." Dunlap also stated that Sunbeam "intend[ed] to have a major merger/acquisition done before June."

(16) Sunbeam's Form 10–K for the year ended December 28, 1997, filed on March 6, 1998. The Form 10–K, signed by Dunlap, Kersh, Gluck, Rutter, and Kristol contained the same financial results as reported in the January 1998 press release. Annexed as an Exhibit to the 1997 10–K was Arthur Andersen's unqualified opinion on Sunbeam's fiscal year 1997 financials.

(17) A March 19, 1998 press release which warned that Sunbeam might not meet analysts' earnings forecasts for the first quarter of 1998 stating that "the shortfall from analysts' estimates, if any, would be due to changes in inventory management and order patterns."

(18) Statements by Sunbeam and Dunlap reported in Bloomberg News, that "sales fell because last minute orders for its outdoor grills didn't materialize as expected," and that "the company also passed on opportunities to sell its brands at a lower profit."

(19) Statements made by Dunlap during a April 3, 1998 conference call to analysts. During the call Dunlap stated "I believe we did not adequately communicate the one time charges and other issues that will result in having a loss for the quarter in today's release."

(20) An April 23, 1998 press release that stated that Sunbeam had "duly, timely and accurately made all disclosures required of it by the securities laws and has fully informed investors of all facts regarding Sunbeam and its business as and when they became known to it."

(21) A May 11, 1998 press release announcing its results of operations for the first quarter of 1998. Sunbeam reported net sales of $244.3 million, and a net loss from continuing operations of $39 million, or $0.45 per share. Notwithstanding these reported losses, Dunlap stated that "the Sunbeam turnaround is real."

(22) Statements made by Dunlap and Sunbeam senior management at a May 1998 meeting with market analysts. At this meeting Dunlap and Kersh made certain predictions for Sunbeam's Second Quarter 1998 sales and earnings.

(23) Sunbeam's Form 10–Q for the first quarter of 1998, filed on May 15, 1998, which reiterated the previously announced results of operations in the May 1998 press release.

(24) A June 8, 1998 press release in which Sunbeam categorically denied claims of accounting fraud contained in a June 1998 *Barron's* article. The release stated that "all of Sunbeam's accounting was proper under generally accepted accounting principles (GAAP) and audited by Arthur Andersen LLP."

(25) A June 15, 1998 press release announcing that Sunbeam had removed Dunlap from his position as Chairman and Chief Executive Officer. The release stated "this action did not result from any concern about the Company's 1997 audited financial statements. Arthur Andersen LLP, Sunbeam's auditor has assured the Board that Sunbeam's audited financial statements are accurate in all material respects."

## D. Events Signaling the Close of the Class Period

On June 30, 1999, Sunbeam announced that the Audit Committee of its Board of Directors would conduct a review into the

accuracy of its 1997 financial statements. The Audit Committee retained Deloitte & Touche LLP to assist in the review, along with Arthur Andersen LLP. Sunbeam stated that "pending the completion of its review, its 1997 financial statements and the report of Arthur Andersen LLP should not be relied upon. Such review could result in a restatement of the 1997 financial statements and the first quarter 1998 Form 10–Q." On August 6, 1998, Sunbeam announced that it would "be required to restate its audited financial statements for the first quarter of 1997 and possibly for 1996, as well as its unaudited financial statements for the first quarter of 1998." On June 30, 1999, the close of the class period, Sunbeam common stock traded at $10 7/16 per share, after trading as high as $52 per share during the class period.

## II. Motion to Dismiss Standard

For the purpose of the motion to dismiss, the complaint is construed in the light most favorable to the plaintiff, and all facts alleged by the plaintiff are accepted as true. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). It is well-settled that a "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The Court should ignore those allegations that contain no more than opinions or legal conclusions. *See South Florida Water Management Dist. v. Montalvo,* 84 F.3d 402, 409 n. 10 (11th Cir.1996).

"In determining whether to grant a Rule 12(b)(6) motion, the Court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account." *Watson v. Bally Mfg. Corp.,* 844 F.Supp. 1533, 1535 n. 1 (S.D.Fla.1993), *aff'd,* 84 F.3d 438 (11th Cir.1996), *citing to,* 5A Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure* § 1357, at 299

(1990). Where the plaintiff has referred to certain documents in the complaint that are "central to the plaintiff's claim," the Court "may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the defendant's attaching such documents to the motion to dismiss will not require the conversion of the motion into a motion for summary judgment." *Brooks,* 116 F.3d at 1369. In a securities fraud case, when deciding a motion to dismiss, the court also "may consider the contents of relevant public disclosure documents which (1) are required to be filed with the SEC, and (2) are actually filed with the SEC." *Lovelace v. Software Spectrum Inc.,* 78 F.3d 1015, 1018 (5th Cir.1996); *accord Kramer v. Time Warner Inc.,* 937 F.2d 767 (2nd Cir. 1991). Thus, the Court shall consider the facts alleged in the complaint, those documents attached to or incorporated into the complaint, and matters that can be judicially noticed including SEC filings. *See Malin v. Ivax Corp.,* 17 F.Supp.2d 1345, 1352 (S.D.Fla.1998) (stating that SEC filings required to be filed and actually filed are appropriate for Judicial notice, therefore may be considered in evaluating a motion to dismiss).

## III. Standard for Pleading Violations of Section 10(b) and 20(a)

In this Complaint, Plaintiffs argue that Defendants violated Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) (hereinafter "Section 10(b)"), and 17 C.F.R. § 240.10b–5 (hereinafter "Rule 10b–5"), by failing to disclose material facts and making false statements regarding the financial status of Sunbeam.

### A. Section 10(b) and Rule 10b–5

Section 10(b) makes it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule

10b–5 prohibits the making of any untrue statement of material fact or the omission of a material fact that would render statements made misleading in connection with the purchase or sale of any security. *See* 17 C.F.R. § 240.10b–5. To successfully state a securities fraud claim under Rule 10b–5, a plaintiff must show the following: (1) a misstatement or omission; (2) of a material fact; (3) made with scienter; (4) on which the plaintiff justifiably relied; (5) that proximately caused the plaintiff's injury. *See Robbins v. Koger Properties, Inc.,* 116 F.3d 1441, 1447 (11th Cir.1997).

### B. Federal Rule of Civil Procedure 9(b)

■ In order to survive a motion to dismiss, Plaintiffs' claim of fraud under Rule 10b–5 must also satisfy the requirements of Federal Rule of Civil Procedure 9(b), which requires that the "circumstances constituting fraud ... be stated with particularity." *See, e.g., Gross v. Medaphis Corp.,* 977 F.Supp. 1463, 1470 (N.D.Ga.1997). The Rule 9(b) standard assures fair notice to the defendants of the nature of the federal securities claims and the grounds for the claims, such that defendants have adequate information to frame a response. *See Harvey Jasper Retirement Trust v. Ivax Corp.,* 920 F.Supp. 1260, 1265 (S.D.Fla.1995). The Rule will be satisfied if the complaint sets forth what statements or omissions were made in what documents or oral representation; the time and place of the statements or omissions; who made the statements; the content of the statement and the manner

in which they misled the plaintiffs; and what the defendant "obtained as a consequence of the fraud." *Brooks v. Blue Cross and Blue Shield of Florida, Inc.,* 116 F.3d 1364, 1369 (11th Cir.), *reh'g denied,* 116 F.3d 1495 (11th Cir.1997).

### C. Heightened Pleading Requirements under the Reform Act

■ Furthermore, the Private Securities Litigation Reform Act of 1995, Pub.L. No. 194–67, 109 Stat. 743, codified at 15 U.S.C. § 78u–4(b) (hereinafter "Reform Act"), establishes heightened pleadings requirements for certain private securities actions. If these additional requirements are not met, the Court must dismiss the action. 15 U.S.C. § 78u–4(b)(3). Section 78u–4(b) imposes two requirements. First, the plaintiff must specify each statement alleged to have been misleading and the specific reason or reasons why such statement is misleading. 15 U.S.C. § 78u–4(b)(1).[4] This provision requires pleading with particularity all facts upon which the plaintiff is basing the fraud allegation, and thus is even more specific than the Rule 9(b) standard. *Malin,* 17 F.Supp.2d at 1361.

Second, the would-be plaintiff, for each alleged misrepresentation, must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).[5]

■ The predicate question presented is what state of mind is required under the

---

4. Section 78u–4(b)(1) states:

> In any private action arising under this title in which the plaintiff alleges that the defendant—
>
> (A) made an untrue statement of a material fact; or
>
> (B) omitted to state a material fact in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
>
> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement

or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

5. Section 78u–4(b)(2), Required State of Mind, states:

> In any private action arising under this title in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to have violated this title, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

statute. When this is determined, the court can evaluate whether the specific facts alleged in the complaint create a strong inference that the defendant possessed that state of mind. The Supreme Court has defined scienter in the Rule 10(b) context as a mental state embracing intent to deceive, manipulate, or defraud. *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The Supreme Court expressly left open the question of whether scienter includes, not only intent, but also recklessness. *See McDonald v. Alan Bush Brokerage Co.,* 863 F.2d 809, 814 (11th Cir. 1989) (quoting *Ernst,* 425 U.S. at 193, n. 12, 96 S.Ct. 1375, stating that "[w]e need not address here the question whether, in some circumstances, reckless behavior is sufficient for civil liability under § 10(b) and Rule 10b–5."). Pre–Reform Act, the Circuits that had addressed the question had determined that recklessness met the scienter requirement. *See, e.g., Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1568–70 (9th Cir.1990), *cert. denied,* 499 U.S. 976, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991); *In re Phillips Petroleum Securities Litigation,* 881 F.2d 1236, 1244 (3d Cir.1989); *Rolf v. Blyth, Eastman Dillon & Co., Inc.,* 570 F.2d 38, 44–47 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978). Specifically, the Eleventh Circuit held that scienter was satisfied by a showing of "severe recklessness."[6] *McDonald,* 863 F.2d at 814. Moreover, the Eleventh Circuit recently reenforced the applicability of the "severe recklessness" standard after the enactment of the Reform Act, holding that a "complaint alleging with particularity that a defendant acted with a severely reckless state of mind still suffices to state a claim for civil liability under § 10(b) and Rule

10b–5." *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1283 (11th Cir.1999). Further, in *Bryant,* the Eleventh Circuit stated that while averments of motive and opportunity to commit fraud "may be relevant to a showing of severe recklessness ... such allegations, without more, are not sufficient to demonstrate the requisite scienter." *Id.* at 1285. It is from this point that we begin our analysis.

**IV. Analysis of Plaintiffs Allegations on Section 10(b) and Rule 10b–5 Claims:**

Plaintiffs claim that Defendants made false and materially misleading statements and omissions in violation Section 10(b) and Rule 10b–5.[7] In accordance with the requirements for bringing a claim under Rule 10b–5, Plaintiffs have alleged that Defendants made misstatements and/or omissions of material fact, with scienter, in connection with the purchase of securities, upon which Plaintiffs relied, and that reliance proximately caused Plaintiffs' injury. Plaintiffs also maintain that they have stated with particularity the circumstances constituting fraud as required by Fed. R.Civ.P. 9(b). Defendants argue that this case should be dismissed because Plaintiffs have failed to meet the additional heightened pleading standards required under the Reform Act. The Court will now consider each of the five pending motions to dismiss.

**A. Albert Dunlap and Russell Kersh**

In order to survive a motion to dismiss, Plaintiffs must plead facts, not solely based on motive and opportunity evidence, constituting strong circumstantial evidence of reckless or conscious misconduct. De-

---

6. The Court further defined severe recklessness as "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been

aware of it." *McDonald,* 863 F.2d at 814 (citations omitted) (further noting Seventh and Ninth Circuit cases holding that, rather than being merely a greater degree of ordinary negligence, recklessness is closer to a lesser form of intent).

7. *See* Part I. *supra.*

fendants argue that Plaintiffs have failed to plead fraud with particularity and additionally that the facts plead do not give rise to a strong inference of scienter as required by the Reform Act. We do not agree.

■ As to Defendants' argument that Plaintiff's have failed to adequately plead fraud, Plaintiffs' complaint clearly alleges facts sufficient to withstand a motion to dismiss. The Complaint sets forth in detail and with particularity the statements Plaintiffs allege to be false, when the statements were made, who made the statements, why the statements are false, and what the Defendants stood to gain in making the statements. Moreover, the Complaint identifies the sources of the facts alleged, such as Sunbeam's own admission that its financial statements prior to and during the class period were false, Arthur Andersen's admission that the statements were false, interviews with former Sunbeam employees, and articles published in the financial press. Accordingly we find that Plaintiffs have satisfied the requirements of Federal Rule of Civil Procedure 9(b).

■ Turning to Defendants' argument that Plaintiffs have failed to adequately plead scienter, relying upon the Eleventh Circuit's recent holding in *Bryant*, we find that Plaintiffs Complaint adequately pleads scienter as to both Dunlap and Kersh. Plaintiffs' Complaint details both direct and circumstantial evidence of both Dunlap's and Kersh's actual knowledge and/or reckless state of mind. *See, e.g., Marksman Partners, L.P. v. Chantal Pharmaceutical Corp.,* 927 F.Supp. 1297, 1313 (C.D.Cal.1996). For example, Plaintiffs have plead's number of instances where Dunlap and Kersh were directly confronted by wall-positioned Sunbeam employees about Sunbeam's revenue recognition practices and about statements made on behalf of Sunbeam to securities analysts. Further, the Complaint alleges

that the use of the allegedly fraudulent accounting practices to manipulate financial results was common knowledge at Sunbeam, and details instances where the practice was openly discussed and joked about among upper-level Sunbeam employees, including Dunlap and Kersh.[8]

Moreover, in addition to alleging instances in which Dunlap and Kersh were confronted by employees, the Complaint also alleges that Dunlap and Kersh were confronted by the financial media about improper accounting and financial reporting practices. For example, in June 1997, *Barron's* published an article which stated the possibility that Sunbeam was engaging in accounting and inventory fraud. Sunbeam strongly denied these allegations and Dunlap flatly rejected them as propaganda stirred up by "shorts." These denials indicate that Dunlap and Kersh, were either sufficiently familiar with the facts, or severely reckless in not being familiar, to be in a position to issue a denial. As such, Sunbeam's and Dunlap's denials demonstrate, at a minimum, extreme recklessness on the part of Kersh and Dunlap. *See Rehm v. Eagle Fin. Corp.,* 954 F.Supp. 1246, 1256 (N.D.Ill.1997) ("defendant's attempts to mollify public doubt about [the corporation's] financial health by putting an optimistic and reassuring 'spin' on otherwise damaging [reports] shows the defendants acted with knowledge...").

Further, the circumstantial evidence detailed in the Complaint strongly suggests that Dunlap and Kersh acted with scienter. *See Sirota v. Solitron Devices, Inc.,* 673 F.2d 566, 573 (2d Cir.1982). This circumstantial evidence includes the diverse and continuing nature of the alleged fraud, the circumstances surrounding Dunlap's termination from Sunbeam, and the allegation that the practices which caused the misstatements of the financial condition of Sunbeam were instituted by Dunlap and Kersh. Moreover, the extraordinary accu-

---

**8.** While Dunlap and Kersh attack the veracity of Plaintiffs allegations, the motion to dismiss stage is not the proper venue for such attacks

because the Court accepts all allegations in the Complaint as true. *See Hishon,* 467 U.S. at 73, 104 S.Ct. 2229.

mulation of inventory at Sunbeam, and the necessary expenditures to store this inventory, served to place Defendants on notice of the alleged activities, and therefore further support a strong inference of scienter. *See, e.g., Miller v. Material Sciences Corp.,* 9 F.Supp.2d 925, 928 (N.D.Ill.1998). Further, while not sufficient standing alone to demonstrate scienter, Plaintiffs' allegations of motive and opportunity to commit fraud on the part of Dunlap and Kersh, are "relevant to a showing of severe recklessness," and in this case strongly support such a finding. *Bryant,* at 1285. As such, the Complaint adequately alleges scienter as to Dunlap and Kersh.

Defendants finally argue that the alleged statements are not actionable as a matter of law. Specifically, Defendants argue that, (1) Sunbeam's statements in the press releases and the SEC filings are forward looking statements and not actionable under Rule 10(b)'s safe harbor, and (2) the Complaint fails to allege sufficient entanglement between the securities analysts and Sunbeam to hold the corporation liable for the analysts' statements. The Court will address each point in turn.

■ Although Defendants are correct that the Reform Act creates a "safe harbor" which protects forward looking statements from 10(b) liability, 15 U.S.C. § 78u–5(c)(1), the statutory safe harbor does not protect Defendants from liability based on "statements that misrepresent historical/ hard or current facts." *Gross v. Medaphis Corp.,* 977 F.Supp. 1463 (N.D.Ga.1997). Further, the clear language of the Reform Act expressly excludes from the safe harbor statements that are "included in a financial statement prepared in accordance with generally accepted accounting principles." 15 U.S.C. § 78u–5(b)(2)(A). Upon a close examination of the statements alleged in the Complaint, the Court concludes that while it is possible that further development of the facts of this case could result in a determination that some of these alleged statements fall within the safe harbor provision, it is clear that the majority of the alleged

statements fall outside the protection of the Reform Act's safe harbor. As such, it would be imprudent to grant Defendants' motion to dismiss based upon the possibility that some of the alleged statements may be protected by the statutory safe harbor. *See, e.g., Harvey Jasper Retirement Trust v. Ivax Corp.,* 920 F.Supp. 1260, 1268 (S.D.Fla.1995).

■ With regard to Defendants' liability premised upon the statements of securities analysts, the law is clear that Section 10(b) liability can be predicated on a defendant's false statement to securities analysts or to the financial or news media. *See Basic v. Levinson,* 485 U.S. 224, 228, n. 4, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). *See also In re John Alden Fin. Corp. Securities Litigation,* Case No. 95–0830–CIV–NESBITT (S.D.Fla.1996); *Harvey Jasper Retirement Trust,* 920 F.Supp. at 1267. A company may be held liable for statements made to analysts that reach the market, where the plaintiff alleges entanglement between the Company's executives and the analysts. *See, e.g., Gross,* 977 F.Supp. at 1474.

As alleged by Plaintiffs, Defendants used private securities analysts to mislead the public about the financial condition of Sunbeam and its operations. Plaintiffs allege that it was Sunbeam's practice to have officers communicate with analysts frequently, in conference calls, meetings and analyst briefings, in order to falsely present the operations and allegedly successful prospects of Sunbeam to the marketplace and inflate artificially the price of Sunbeam common stock. Plaintiff identifies specific materially false and misleading reports, and the practices that led to the issuance of such reports. In the context of the entirety of the facts alleged in the Complaint, we find that these claims for liability allege sufficient facts to survive a motion to dismiss. Accordingly, finding that Plaintiffs have satisfied both Federal Rule of Civil Procedure 9(b) and the heightened pleading requirements of the Reform Act as to Dunlap and Kersh, De-

fendants' Motion to Dismiss must .be denied.

Dunlap and Kersh finally move this Court to strike numerous paragraphs in the Complaint pursuant to Federal Rule of Civil Procedure 12(f). A Rule 12(f) motion requires a showing of insufficiency, redundancy, immateriality, impertinency, or scandalous material. *Fed.R.Civ.P.* 12(f). Motions to strike pleadings are generally disfavored, and will be granted only when the paragraph has "no possible relation to the controversy." *Carlson Corp. v. School Board of Seminole County,* 778 F.Supp. 518, 519 (M.D.Fla.1991). Defendants have not met this exceedingly high standard, and as such, the Motion to Strike is denied.

## B. Sunbeam Corporation, William T. Rutter, Howard G. Kristol, and David C. Fannin

Similar to Dunlap and Kersh, Sunbeam, Rutter, Kristol, and Fannin argue that Plaintiffs' Complaint fails to adequately plead scienter, and that the Complaint is based upon statements that are not actionable as a matter of law.[9] The Court will first address the arguments of Sunbeam and then analyze the merits of the individual Defendants' arguments.

With regard to the scienter requirement, Sunbeam specifically argues that (1) the Complaint fails to adequately plead scienter as to any individual Defendant, and (2) the Complaint does not plead how or why the state of mind of any individual Defendant should be imputed to Sunbeam. As to Sunbeam's first contention, we reject this argument because, for the reasons discussed above, the Court finds that Plaintiffs' Complaint adequately pleads scienter as to Dunlap and Kersh. Accordingly, we will now consider whether Dunlap and Kersh's state of mind is properly imputed to Sunbeam.

 While Sunbeam is correct that not all acts of a corporation's officers can

be attributed to the corporation, courts have uniformly held that the acts of a corporate officer that are intended to benefit a corporation to the detriment of outsiders are properly imputed to the corporation. *See Seidman & Seidman v. Gee,* 625 So.2d 1, 2 (Fla.Dist.Ct.App.1992). Moreover, the knowledge of individuals who exercise substantial control over a corporation's affairs is properly imputable to the corporation. *See American Standard Credit, Inc. v. National Cement Co.,* 643 F.2d 248, 270–71 & n. 16 (5th Cir. 1981). Accordingly, consistent with the general principles of agency and corporate law, the scienter of Sunbeam's officers is properly imputed to Sunbeam itself. Therefore, because Plaintiffs' Complaint adequately pleads scienter as to Dunlap and Kersh, and because that scienter is appropriately imputed to Sunbeam, Defendants' Motion to Dismiss as to Sunbeam Corporation must be denied. The Court will now consider the arguments of the individual Defendants.

Rutter, Kristol and Fannin make two arguments in support of their motion. First they contend that Plaintiffs have failed to plead with particularity which Defendant made each of the alleged statements, and second they assert that the Complaint does not adequately plead scienter as to each of them.

 The Court will first address Defendants' argument that the Complaint fails to plead fraud with the requisite particularity. Federal Rule of Civil Procedure 9(b) requires a plaintiff to attribute fraudulent acts or statements to a particular defendant. However, under the group pleading doctrine, allegations of securities fraud based upon statements in group published information are presumed to be the collective action of corporate officers involved in the day-to-day management of the corporation. *See, e.g., In re Checkers Securities Litigation,* 858 F.Supp. 1168,

**9.** Having found that the majority of the alleged statements are not covered by the statutory safe harbor provisions, the Court will not discuss this argument, but instead directs the parties to the discussion of the applicability of the safe harbor provision *supra*.

1178 (M.D.Fla.1994). Defendants contend that the Reform Act's emphasis on particularity has effectively overruled the group pleading doctrine. We do not agree. Although the Court recognizes that some courts have questioned the continuing vitality of the group pleading doctrine, see *Allison v. Brooktree Corp.*, 999 F.Supp. 1342, 1350 (S.D.Cal.1998), we find that the rationale behind the group pleading doctrine sound and will not disturb it absent direction from the Eleventh Circuit. The Court notes that this conclusion is consistent with both the language of the Reform Act, and the overwhelming majority of courts to consider the matter. Given that Plaintiffs have alleged that each of the individual Defendants, due to their high ranking positions at Sunbeam, were directly involved in controlling the content of the information released by the Sunbeam, Defendants are not entitled to a dismissal on this basis.

■ However, while the group pleading doctrine may satisfy the Rule 9(b)'s requirement of particularity, group pleading does not apply to the Reform Acts scienter requirements. Indeed, the Reform Act requires that a complaint (1) "state with particularity" "facts" (2) giving rise to a "strong inference" (3) that each separate defendant acted with scienter (4) "with respect to each act or omission alleged." 15 U.S.C. § 78u–4(b)(2). Rutter, Kristol, and Fannin contend that Plaintiffs have failed to plead scienter as to each of them. The Court will analyze Fannin's argument first, then discuss the claims of Rutter and Kristol.

■ Plaintiffs assert that Fannin's scienter is demonstrated by his membership on Sunbeam's Operating Committee, his desire to see Sunbeam succeed, and his incentive-based compensation plan. These allegations, without more, are insufficient as a matter of law to withstand a motion to dismiss. Such conclusory pleading is exactly the kind of practice the Reform Act was enacted to police. As noted in *Malin*, 17 F.Supp.2d at 1351, because such facts "can be ascribed to virtually all corporate officers and directors, they fail to raise a strong inference of knowing or reckless conduct." The lack of particularity of Plaintiffs' allegations with regard to Fannin is readily apparent when contrasted to the specific allegations regarding the knowledge of Dunlap and Kersh. Indeed, Plaintiffs' Complaint as to Fannin asserts little more than guilt by association.

Despite the Complaint's lack of specificity as to Fannin's scienter, Plaintiffs argue that this Court should infer scienter based upon Fannin's motive and opportunity to commit securities fraud. Although motive and opportunity are relevant to a finding of extreme recklessness, the law is clear that without more, motive and opportunity pleading is insufficient to withstand a motion to dismiss. *Bryant* at 1285. Accordingly Plaintiffs' Complaint must be dismissed as to Defendant David Fannin. We now consider the arguments of Rutter and Kristol.

■ Similar to its allegations regarding Fannin, the Complaint alleges that the fact that Messrs. Rutter and Kristol held positions on the Sunbeam Audit Committee raises a strong inference that they acted with the requisite scienter with regard to both the SEC filings and the group published statements. Such conclusory allegations are insufficient as a matter of law to maintain a Section 10(b) action. *See Jacobs v. Coopers & Lybrand*, No. 97 Civ. 3374(RPP) 1999 WL 101772, at *16 (S.D.N.Y.1999). Although the Complaint amply demonstrates negligence as to Rutter and Kristol's ineffective monitoring of Sunbeam's accounting mechanisms, the Reform Act requires a much greater degree of culpability to maintain a securities fraud action: extreme recklessness. Indeed, the Eleventh Circuit has defined severe recklessness as "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is

either known to the defendant or is so obvious that the defendant must have been aware of it." *McDonald,* 863 F.2d at 814. Of particular import to this Court's determination is the Complaint's complete lack of any particularized allegations of scienter on the part of the Audit Committee members. Further, Rutter and Kristol's level of removal from the day-to-day operations of Sunbeam severely weakens the impact of Plaintiffs' "red flag" allegations. As such, the Complaint fails to allege facts sufficient to raise such an inference as to Rutter and Kristol, and must be dismissed as to both of them.

## C. Donald Uzzi

The essence of Uzzi's argument in support of his motion to dismiss is that Plaintiffs have not adequately alleged his personal responsibility for each of the allegedly false statements. Specifically, Uzzi asserts that the group pleading doctrine on which Plaintiffs rely has been overruled by the provisions of the Reform Act and the Supreme Court's holding in *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). These arguments are not well taken, and as such, Uzzi's motion to dismiss is denied.

▮ As discussed above, a review of the language of the Reform Act and the relevant case law provides little support for Uzzi's position. Although the Court is aware that a district court in the Southern District of California has held to the contrary, we find the reasoning of the overwhelming majority of courts to consider the issue highly persuasive. Accordingly, we reject Uzzi's argument and hold that the Reform Act has no effect on the continued viability of the group pleading doctrine.

▮ Uzzi's argument that the Supreme Court's holding in *Central Bank* forecloses the viability of group pleading, is similarly flawed. Nowhere in *Central Bank* does the Supreme Court even tangentially address the issue of group pleading, much less endorse Uzzi's proposed expansive reading. *Central Bank* simply stands for the proposition that there is no implied cause of action for aiding and abetting a primary Section 10(b) claim. In no way does the case restrict the ability of a plaintiff to allege primary violations of Section 10(b) against groups of defendants. Indeed, in *Central Bank* the Supreme Court expressly acknowledged that "in any complex securities fraud, there are likely to be multiple violators." *Central Bank,* 511 U.S. at 191, 114 S.Ct. 1439.

Moreover, even if Uzzi's liability could not be premised upon the group publication of the press releases, Uzzi's independent statements to the press contributed to the alleged fraud and are actionable. Plaintiffs' Complaint provides the dates of Uzzi's statements, the persons to whom the statements were made, and details of his participation in the operations of Sunbeam. As such, the statements made by Uzzi and published in the *Bloomberg News* are independently actionable. *See In re ValuJet, Inc. Securities Litigation,* 984 F.Supp. 1472, 1477 (N.D.Ga.1997). Further, the Complaint adequately alleges scienter as to Uzzi. Plaintiffs detail Uzzi's role in the day-to-day operations of Sunbeam and his intimate involvement in many of the allegedly fraudulent sales practices. Indeed, as the officer in change of sales, Uzzi had a clear vantage point to observe the alleged activities. As such, the allegations in the Complaint raise a strong inference of scienter, and Uzzi's motion to dismiss is denied.

## D. Robert Gluck

Gluck forwards two arguments in support of his motion to dismiss. First he argues that Plaintiffs failed to properly serve the summons and complaint pursuant to the Federal Rules of Civil Procedure, and second that the Complaint fails to adequate plead scienter as to him. We do not agree, and as such, Gluck's motion to dismiss is denied.

■ Gluck first argues that he was not timely served in compliance with Federal Rule of Civil Procedure 4(m), and should therefore be dismissed from the action.[10] The procedural history of this action, while admittedly complex, severely belies Gluck's contention. On June 17, 1998, this Court ordered that the then currently pending Sunbeam securities cases be consolidated into one case and that Lead Counsel file a consolidated amended complaint on behalf of all the plaintiffs against all defendants. Lead Counsel and the Defendants then stipulated that a consolidated amended complaint would be filed within fifteen days after Sunbeam issued the last of its restated financial results. On July 16, 1998, Patrick J. Stapleton, III, filed a class action complaint in this Court, naming Sunbeam, Gluck, and several other former Sunbeam officers as defendants. The Stapleton Complaint was the first pleading to name Gluck as a defendant. The Stapleton Plaintiffs then filed a series of motions challenging the consolidation of the Stapleton Action into Lead Plaintiffs' case. On December 4, 1998, this Court denied the Stapleton Plaintiffs' motions. Later in December 1998, Sunbeam issued the last of its financial restatements for 1997 and 1998. This triggered Lead Plaintiffs' obligation to file the Consolidated Amended Complaint. Plaintiffs complied with this obligation and served Gluck within 120 days of the filing of the complaint.

Gluck does not contest that he was served with the Consolidated Amended Complaint within 120 days of its filing, but instead argues that because he was not served with the Stapleton Complaint within 120 days of its filing the Consolidated Amended Complaint must be dismissed as to him. The reasoning underlying this argument escapes the Court. Simply stated, the first Complaint filed by Lead Plaintiffs which named Gluck as a defendant the Consolidated Amended Complaint—was properly served upon Gluck. Accordingly Gluck was served with the Consolidated Amended Complaint in compliance with Federal Rule of Civil Procedure 4(m). Further, even if Gluck were improperly served, good cause exists for any delay in service, and it is apparent the Gluck was not prejudiced in anyway by the delay. *See United States v. Jack Cozza, Inc.*, 106 F.R.D. 264, 268 (S.D.N.Y.1985). Accordingly, dismissal of the Consolidated Amended Complaint on this procedural ground would be inappropriate. *See, e.g., Pardazi v. Cullman Medical Center*, 896 F.2d 1313 (11th Cir.1990).

■ The Court similarly rejects Gluck's argument regarding the Complaint's allegations of scienter. The Complaint adequately alleges scienter as to Gluck. The Complaint alleges that Gluck was the Controller of Sunbeam, and thus was responsible for monitoring and managing the company's accounting practices. Further the Complaint alleges that given his role as Controller, Gluck was privy to information that showed the falsity of Sunbeam's financial statements during 1997–1998. These allegations alone demonstrate that Gluck either had knowledge or was reckless in not knowing the falsity of the accounting statements. *See Escott v. BarChris Constr. Corp.*, 283 F.Supp. 643, 686 (S.D.N.Y.1968). Further, the Complaint also alleges Gluck's key role in the alleged fraud and instances in which he was confronted with concerns over the suspect nature of Sunbeam's financial statements. Indeed, the problems in Sunbeam's accounting control program, the program which Gluck oversaw, are painstakingly detailed in the Complaint. Further, the Complaint details several "red

**10.** Federal Rule of Civil Procedure 4(m) states:

> If a service of a summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate period.

flags" which Gluck either consciously ignored or recklessly disregarded, such as the public allegation of accounting impropriety in the *Barron's* articles. As such, the facts alleged in the Complaint give rise to a strong inference of Gluck's scienter.

Gluck argues that similar to the members of the Audit Committee, his mismanagement of Sunbeam's accounting controls does not demonstrate extreme recklessness as required by *Bryant*, but rather only establishes mere negligence. This argument, however, ignores the Complaint's allegations of the key role Gluck played in the day-to-day operation of Sunbeam. No such allegations were leveled at Kristol and Rutter. Indeed, it is Gluck's intimate involvement with the accounting and operations of Sunbeam which raise the strong inference of extreme recklessness. As such, Gluck's motion to dismiss is denied.

### E. Arthur Andersen L.L.P.

Defendant Arthur Anderson asserts that Plaintiffs fail to state a Rule 10b–5 claim against Arthur Andersen for two reasons: (1) Plaintiffs cannot satisfy Rule 10b–5's scienter requirement as required by the heightened pleading standards of the Reform Act; (2) Plaintiffs fail to allege their Rule 10b–5 claim against Arthur Andersen with the particularity required under the Reform Act and Federal Rule of Civil Procedure 9(b).[11] For the following reasons, we find that Plaintiffs have pled facts sufficient to state a claim under Rule 10b–5 and deny Defendant's motion.

Arthur Andersen reduces Plaintiffs' allegations of scienter to Arthur Andersen's publication of inaccurate accounting figures and its failure to follow accounting and auditing principles. Arthur Andersen does not deny that it violated accounting and auditing principles in reviewing Sunbeam's books. Nor does it deny Plaintiffs' allegation that its Unqualified Audit Opinion validating Sunbeam's financial reports proved to be ma-

terially false and misleading. Indeed, Arthur Andersen subsequently disavowed its Unqualified Opinion, announcing that it "should not be relied upon." Arthur Andersen does, however, argue that these allegations are insufficient to establish scienter. In so concluding, Arthur Andersen fails to appreciate the breadth of Plaintiffs' allegations.

The substance of the cases cited by Arthur Andersen is that "[t]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter." *In re Software Toolworks Inc.*, 50 F.3d 615, 627 (9th Cir. 1994). Plaintiffs, however, provide more, alleging that Arthur Andersen's wrongdoing ran deeper than innocent auditing and accounting slip-ups, asserting the following facts to demonstrate that Arthur Andersen acted with severe recklessness in issuing its misleading Unqualified Audit Opinion:

- Although Arthur Andersen knew or was severely reckless for not knowing that Sunbeam's internal controls were virtually non-existent—only two people comprised the company's entire internal audit staff—it elected not to expand its audit in violation of a GAAS (Generally Accepted Auditing Standards) requirement that it have a sufficient understanding of Sunbeam's internal control structure and plan its audit accordingly.

- Plaintiffs allege that Arthur Andersen failed to adhere to GAAS by not identifying numerous "fraud risk factors" that suggested that there was a significant risk that Sunbeam had fraudulently misstated its financial statements.

- A Sunbeam employee tipped off Arthur Andersen that Sunbeam had overstated its restructuring reserves by expending in 1996 what should have been expensed in 1997. At least $20 million of the restructuring reserve

11. Having found that Plaintiffs' Complaint satisfies the requirements of Federal Rule of Civil Procedure 9(b), the Court will not discuss this argument, but instead directs the parties to the discussion of this issue *supra*.

was improperly expensed in 1996. In addition, a knowledgeable Sunbeam employee alerted Arthur Andersen that Sunbeam's bill and hold sales should be questioned because they were invalid. That employee questioned whether a physical inventory, segregated by customer, had been performed as required by the SEC. Sunbeam later issued a restatement related to the improper recognition of $29 million in revenues from 1997 bill and hold transactions. Despite being alerted to material misstatements in Sunbeam's financial statements, Arthur Andersen issued its Unqualified Audit Opinion.

● Arthur Andersen failed to stop Sunbeam from recognizing, in violation of GAAP, revenues from guaranteed sales and consignment sales transactions. By recognizing such revenues, Sunbeam overstated its reported revenue for 1997 by $36 million.

● Arthur Andersen knew of or was severely reckless not to know of an article in *Barron's* as Arthur Andersen audited Sunbeam's 1997 financial statements. The article, dated June 6, 1998, accused Sunbeam of manipulating its 1996 and interim 1997 financial statements, the very conduct at issue in this case. Arthur Andersen did not follow up on these allegations in violation of GAAS. Indeed, Arthur Andersen permitted Sunbeam to state in a June 8, 1998 press release that Arthur Andersen continued to be comfortable with its Unqualified Audit Opinion. Finally, on June 15, 1998, the date Sunbeam announced its firing of Dunlap, Arthur Andersen allowed Sunbeam Director Peter A. Langerman to assert publicly that Arthur Andersen had "assured the board that Sunbeam's audited financial statements [were] accurate in all material respects." Not until June 25, 1998, by refusing to consent to the use of its Audit Opinion in an SEC registration statement, did Arthur Andersen give

any indication to the public that it no longer stood behind its Audit Opinion.

● The sheer magnitude of the restatements of Sunbeam's financial statements suggests that Arthur Andersen should have known or was severely reckless not to know that its Unqualified Audit Opinion was misleading. *See In re Leslie Fay Cos., Inc.*, 835 F.Supp. 167, 175 (S.D.N.Y.1993) ("[i]n cases where small accounting errors only ripple through the corporate books, a court may conclude ... that an accountant's failure to discover his client's fraud was not sufficiently reckless to sustain a 10–b5 claim. On the other hand, when tidal waves of accounting fraud are alleged, it may be determined that the accountant's failure to discover his client's fraud raises an inference of scienter on the face of the pleading.")

We find *Jacobs v. Coopers & Lybrand, L.L.P.*, 1999 WL 101772 (S.D.N.Y. Mar.1, 1999) to be instructive. In *Jacobs*, plaintiffs alleged that defendant accounting firm, Coopers & Lybrand, conducted an audit so deficient that it grossly violated GAAS and allowed the company that had issued them securities to disseminate materially false and misleading audited financial statements and financial results to the market. *Jacobs*, 1999 WL 101772, *2. Recognizing that an auditing firm's failure to follow GAAS, without more, does not constitute a § 10(b) violation, the court concluded that "Plaintiffs more than just allege that the Coopers failed to adhere to GAAS in its audit ... They put this failure in a broader context with allegations that, taken together, paint a portrait of an audit so reckless that a jury could infer intent to defraud." *Id.* at *14. The alleged failures to adhere to GAAS in *Jacobs* are similar to those pled by Plaintiffs here: Coopers ignored "red flags" that should have raised questions in Coopers mind and led it to obtain additional materials, *id.* at *2; Coopers did not adequately plan and supervise its audit, which led to its failure to acquire

sufficient evidential material, *id.* at *6; Coopers did not understand its client's internal control structure and therefore did not understand or recklessly disregarded certain weaknesses, *id.* at *7. The court specifically noted that "Plaintiffs' allegations that Coopers had knowledge of [its client's] internal workings and had a history with the company, taken together, support a claim that the failures to observe GAAS in this particular audit amount to a level of recklessness high enough to maintain an action under § 10(b)." *Id.* at *15. Here, Plaintiffs point out that Arthur Anderson had been auditing Sunbeam since at least 1990 and must have been aware that Sunbeam's internal audit team was short-staffed, for it met with the staff members during the course of the audit.

The cases cited by Arthur Andersen can be distinguished. In support of its argument that Plaintiffs cannot show scienter by alleging violations of accounting and auditing principles, Arthur Andersen relies upon *Zucker v. Sasaki,* 963 F.Supp. 301 (S.D.N.Y.1997). In that case, plaintiff offered no factual support for her assertion that defendant accounting firm, Ernst & Young, knew or should have known that there was no reasonable basis for certain findings contained in its audit report. *Zucker,* 963 F.Supp. at 306. She simply made the conclusory, fact-deficient allegation that as the issuing company's auditor with access to the company's books, Ernst & Young knew or should have known that the company had overstated the goodwill of a company it had purchased. *Id.* In contrast, Plaintiffs here do not rest upon conclusory allegations, but instead plead facts demonstrating that Arthur Andersen did in fact know or was severely reckless for not knowing that Sunbeam was engaged in accounting improprieties.

The cases Arthur Andersen cites to supports its related argument that Plaintiffs cannot show scienter by alleging that Arthur Andersen certified an allegedly fraudulent financial statement are similarly distinguishable. Those cases, too, require plaintiffs to demonstrate more than that a defendant performed its job negligently by

refusing to Infer fraud from the mere fact that an auditor certified an inaccurate financial statement. *See, e.g., Schick v. Ernst & Young,* 141 F.R.D. 23, 27 (S.D.N.Y.1992). As demonstrated above, Plaintiffs do not rely on the mere fact that Arthur Andersen certified Sunbeam's fraudulent statement to establish scienter. Accordingly, Arthur Andersen's motion to dismiss is denied.

## VII. Section 20(a) Controlling Persons Liability

Section 20(a) of the Exchange Act provides that "every person who, directly or indirectly, controls any person liable under any provision of this chapter or any rule or regulation thereunder shall be liable jointly and severally with and to the same extent as such controlled person." 15 U.S.C. § 78t(a). *See Brown v. Enstar Group, Inc.,* 84 F.3d 393 (11th Cir.1996). Based on oral and written statements including press releases and SEC filings, Plaintiffs have alleged facts that would make Section 20(a) applicable to each of the Defendants in this case. Defendants' sole argument for dismissal is that because plaintiffs have failed to plead any claims under Section 10(b) and Rule 10b–5, the Section 20(a) claims also must fall. Because the Court denies the motion to dismiss as to the substantive securities fraud claims, the motion to dismiss as to the 20(a) claims is denied as well.

## VIII. Conclusion

For the reasons stated above, it is hereby ORDERED AND ADJUDGED that,

(1) Defendants Sunbeam Corporation, William T. Rutter, Howard G. Kristol, and David C. Fannin's Motion to Dismiss Consolidated Amended Class Action Complaint is GRANTED IN PART AND DENIED IN PART. The Motion is GRANTED as to William T. Rutter, Howard G. Kristol and David C. Fannin, and DENIED as to Sunbeam Corporation;

(2) Defendants Albert J. Dunlap and Russell A. Kersh's Motion to Dismiss Plaintiffs' Amended Class Action Complaint is DENIED;

(3) Defendant Donald R. Uzzi's Motion to Dismiss the Complaint is DENIED;

(4) Defendant Robert Gluck's Motion to Dismiss Consolidated Class Action Complaint is DENIED; and

(5) Defendant Arthur Andersen LLP's Motion to Dismiss Consolidated Class Action Complaint is DENIED.

It is further ORDERED AND ADJUDGED that Dunlap and Kersh's Motion to Strike is DENIED.